**GLUCK LAW FIRM**
Jeffrey S. Gluck (SBN 304555)
 Jeff@Gluckip.com
16950 Via De Santa Fe
Rancho Santa Fe, CA 92067
Telephone: 310 776 7413

**ERIKSON LAW GROUP**
David Alden Erikson (SBN 189838)
 david@daviderikson.com
Antoinette Waller (SBN 152895)
 antoinette@daviderikson.com
200 North Larchmont Boulevard
Los Angeles, California 90004
Telephone: 323.465.3100
Facsimile: 323.465.3177

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| KRISTA PERRY, an individual; LARISSA MARTINEZ an individual; and JAY BARON an individual;<br><br>Plaintiffs,<br><br>v.<br><br>SHEIN DISTRIBUTION CORPORATION, a Delaware corporation; ROADGET BUSINESS PTE. LTD; ZOETOP BUSINESS COMPANY, LIMITED; and DOES 1-10 inclusive.<br><br>Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiffs Krista Perry, Larissa Martinez, and Jay Baron ("Plaintiffs") hereby bring this complaint against Defendants Shein Distribution Corporation; Roadget Business Pte. Ltd; Zoetop Business Company, Limited; and Does 1-10 inclusive ("Shein" or "Defendants"); as follows.

**INTRODUCTION**

1.       For all the scrutiny given to TikTok, it's surprising that Congress has not considered more dramatic action against the Chinese fast-fashion giant Shein. The brand sells more clothing than any other in the world; and recently raised capital at a staggering $100 billion valuation. Like TikTok, Shein's business model depends on collecting a shocking amount of data from its customers—which it then reverse-engineers into fashion trends. Shein is actually a greater societal threat than TikTok—because it contributes mightily to serious problems beyond data security and privacy, such as environmental damage, sweatshop (or worse) labor conditions, tax avoidance, child safety, as well as the subject of this lawsuit, large-scale and systematic intellectual property theft from U.S. designers large and small.[1] Worse, there is every worry that the Shein high-tech business model, described below, will spread and lead other industries on a race to the bottom.

2.       One wonders why what is effectively the world's third most valuable

---

[1] Congress has indeed recognized the dangers posed by Shein. In April, it issued a stinging rebuke to the brand in the form of an "Issue Brief" detailing some of the same problems described here, "including exploitation of trade loopholes; concerns about production processes, sourcing relationships, product safety, and use of forced labor; and violations of intellectual property rights." Reading through the Brief, however, reveals that even Congress was stymied in its attempts to gather all relevant information, especially about the corporate structure of Shein and who to hold accountable. Due to this factual vacuum, in February 2023, Senators Bill Cassidy (R-LA), Elizabeth Warren (D-MA), and Sheldon Whitehouse (D- RI) wrote to Shein's secretive founder Chris Xu, demanding information on some of these same issues, within thirty days. On information and belief, Shein has thus far ignored the request. The same lack of information is apparent in media accounts. There is no shortage of Shein exposés in major news publications—but none of them contain anything close to a full factual story about who and what Shein is and how it operates. Plaintiffs were forced to engage in extraordinary research to gather the allegations presented here, because their cases involve eventually proving facts relating to the closely guarded secrets of Shein's design process and labyrinthine corporate structure.

private company doesn't do more to shed its outlaw status.[2] Nike devotes unlimited resources to avoiding any hint of sweatshop conditions or other supply chain scandals—while Shein somehow survives grave reports of slave labor and unsafe children's clothing. As explained below, it turns out that avoiding direct blame is another key aspect of Shein's business model, as its decentralized structure often allows it to plausibly redirect blame to third parties as if they were independent, when in fact they are closely controlled by Shein. More to the point, Shein's widely discussed misconduct generates enough upside that it is worth the public relations damage. So far, "bad press" has obviously not taken Shein down. Excited "microinfluencers" still extoll the virtues of their $100 "Shein haul,"[3] even as they come out firmly against overflowing landfills. When news hit of Shein selling Swastikas; or Muslim prayer rugs being sold as decorative "mats;" or necklaces with the word Allah in Arabic being sold with others reading "baby girl" and "scorpio,"

---

[2] Shein would be among the world's top three most valuable private companies— along with SpaceX and Byte-Dance, the owner of TikTok—if it were in fact one company. But as discussed below, while it presents itself as a unitary enterprise, and functions as a single integrated enterprise, there is no single company that can be identified as Shein. Rather, it is a dizzying and ever-changing decentralized amalgamation of companies—and it is this structure that facilitates the intellectual property misappropriation that is the impetus for this action.

[3] A search of #sheinhaul on social media reveals one of the brand's most effective forms of organic viral marketing—which conveniently bypasses the traditional media in bringing the messages of young consumers to other young consumers. Shein sends $100 worth of apparel (which might be fifteen pieces, produced at a trivial cost) to a small-time influencer to gush as they unpack and try on new treasures. The practice is even more effective when carried out by an army of aspiring micro-influencers who hope to add followers as a result of a #sheinhaul video, as Shein strongly encourages them to do.

COMPLAINT

1    Shein gets away with little more than comically token explanations and apologies.[4]

2         3.    But this case is only tangentially about Shein being a generally bad

3    actor (although its imperviousness to criticism extends to intellectual property theft).

4    In this lawsuit, three independent designers allege that Shein produced, distributed,

5    and sold *exact* copies of their creative work. As shown below, these are not the

6    familiar "close call" legal claims where a corporate apparel manufacturer takes

7    inspiration a bit too liberally. At issue here, inexplicably, are truly *exact* copies of

8    copyrightable graphic design appearing on Shein products.

9         4.    When they first saw Shein's copies, Plaintiffs were as surprised as they

10   were outraged. Why would Shein go to the trouble of precisely duplicating their

11   work —when it would be easier and obviously less problematic to simply closely

12   knock them off as other corporate apparel companies often do? But again, as it turns

13   out, exact copying is part and parcel of Shein's "design" process and organizational

14   DNA. As alleged in detail below, Shein's design "algorithm" could not work

15   without generating the kinds of exact copies that can greatly damage an independent

16   designer's career—especially because Shein's artificial intelligence is smart enough

17   to misappropriate the pieces with the greatest commercial potential. Understanding

18   how and why requires unraveling Shein's revolutionary business model, which is in

19   some ways brilliant (as evidenced by the handful of new billionaires it has minted

20   among its founders), but unfortunately also inherently causes some of the high-

21   profile externalities mentioned above, including systematic intellectual property

22   theft. The deeper one digs into Shein's business model, the more it becomes clear

23   that a pattern of systematic criminal intellectual property infringement is baked in

24   _____

25   [4] Shein also maintains a glossy public relations site, touting its good citizenship. The brand is
26   often accused of greenwashing some of most serious problems. In late June, a scandal resulted
     from Shein's courting of influencers with all-expenses-paid trips to China to view a "typical"
27   factory, as reported by the New York Times.

28                                            3                                    COMPLAINT

from the very beginning.

5.      There is no Coco Chanel or Yves Saint Laurent behind the Shein empire. Rather, there is a mysterious tech genius, Xu Yangtian aka Chris Xu, about whom almost nothing is known. He made Shein the world's top clothing company through high technology, not high design. The brand has made billions by creating a secretive algorithm that astonishingly determines nascent fashion trends—and by coupling it with a corporate structure, including production and fulfillment schemes, that are perfectly executed to grease the wheels of the algorithm, including its unsavory and illegal aspects. To the uninitiated, the consumer-facing aspects of the model are utterly unfamiliar. Thousands of new items are offered for sale *every day*, for prices low enough to render the garments truly disposable. Yet even at this incredible volume and low price point, enough of Shein's pieces are so up-to-the-minute trendy as to keep armies of young people eagerly combing through the App for potential purchases. This is a daily activity for Shein fans, like browsing Tik Tok or Instagram. This is, of course, a retailer's dream—customers shopping your App on a regular basis as an enjoyable pastime—which quickly translates to billions of dollars in value.

6.      If Shein's intellectual property theft and blame avoidance is facilitated by its byzantine shell game of a corporate structure, and the willingness of its control group to commit systemic and repeated infringements, as alleged in detail below, there is one legal regime that might provide the remedies necessary to combat such well-organized wrongs distributed across an array of related actors and entities: the civil prong of the Racketeer Influenced and Corrupt Organizations Act (civil "RICO"), which was designed to address the misconduct of culpable individual cogs in an larger enterprise. It is well established that egregious copyright infringement (of the type alleged here, and of the type referenced in other similar cases against Shein) constitutes racketeering—pursuant to a 2005 act of Congress

COMPLAINT

adding "criminal infringement of a copyright" to the definition of "racketeering activity"). Further, and as mentioned, Shein's misconduct is committed not by a single entity, but by a de-facto association of entities. And just as intended by Congress, the same decentralization that facilitates Shein's criminal infringement and other racketeering activity, renders individual components of the enterprise, such as Defendants, liable under civil RICO. Further, Shein has grown rich by committing individual infringements over and over again, as part of a long and continuous pattern of racketeering, which shows no sign of abating. There is no indication that Shein intends to slow down any time soon—and indeed their corporate literature speaks only of projected exponential growth. It is not an exaggeration to suggest that Shein's pattern of misconduct involves commission of new copyright and trademark infringements *every day.*

## JURISDICTION AND VENUE

7.     This Court has original subject matter jurisdiction over this action and the claims asserted herein, under 18 U.S.C. § 1964. This is a civil action arising under 18 U.S.C. §§ 1961-1968, § 901(a) of Title IX of the Organized Crime Control Act of 1970, as amended, otherwise known as the Racketeer Influenced and Corrupt Organization Act ("RICO"), and specifically under 18 U.S.C. § 1964(c) and other causes of action as set forth hereafter. This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. Section 1331 ("federal question jurisdiction") and 1338(a)-(b) ("patent, copyright, trademark and unfair competition jurisdiction") in that this action arises under the laws of the United States and, more specifically, Acts of Congress relating to patents, copyrights, trademarks, and unfair competition.

8.     Each defendant is subject to the personal jurisdiction of the Court because it (either itself or through agents) transacts business in, has agents in, or is otherwise found in and has purposely availed itself of the privilege of doing

COMPLAINT

business in California and in this District, and because the alleged misconduct was directed to California and this district, and Defendants' marketing activities at issue in this case were expressly aimed at California residents (including promotional activities aimed at the West Coast and California apparel market). In addition, Shein and Defendants have specifically directed sales and marketing activity towards California customers by operating a "pop up shop" in Los Angeles in 2022. Defendants are also subject to personal jurisdiction under the "effects test" in that each, with respect to the alleged acts of copyright infringement, (1) committed intentional acts (2) that were expressly aimed at the United States and California, and (3) that caused actual harm that the defendant knows is likely to be suffered in the United States and California.

9.     Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b)(1)-(3) because a substantial part of the events or omissions giving rise to the claims occurred in this District in that, *inter alia*, Defendants have expressly directed their marketing and promotional activities at consumers in Los Angeles.

## PARTIES

10.     Plaintiff Krista Perry is an individual residing in Worcester, Massachusetts. Ms. Perry is a well-regarded and successful illustrator and designer living in Massachusetts. In 2015, she received an honors BFA in illustration from Massachusetts College of Art and Design. Since then, Perry has created artwork for clients like Madewell, Nickelodeon, and Jameson Whiskey.

11.     Plaintiff Larissa Martinez (aka Larissa Blintz) is an individual residing in Los Angeles County, California. Ms. Blintz is the CEO, creator, and owner of "Miracle Eye" a female-owned family-run small business, designing and fabricating ethically handmade-to-order clothing out of their workshop and store in Los Angeles.

6                                        COMPLAINT

12.     Plaintiff Jay Baron is an individual residing in Los Angeles County, California. He is a well-regarded independent artist working between Burbank, California and Austin, Texas. He founded Retrograde Supply Co. when he was 18 and has amassed a large social media following, with his work featured in television, film, and 100+ independent retailers in the United States.

13.     Defendant Shein Distribution Corporation ("SDC") is a Delaware corporation formed in April 2021 and registered to do business in California on May 25, 2021.

14.     Defendant Shein Fashion Group Inc. ("SFG") is an entity of unknown form. SFG has appeared in litigation in the Central District, but no rcord can be found of its formation,

15.     Roadget Business Pte. Ltd ("Roadget") is a private business entity formed in Singapore. Roadget is the owner of the Shein trademarks in the United States (and worldwide) and now owns the website located at https://us.shein.com and the corresponding mobile application.

16.     Zoetop Business Company, Limited, ("Zoetop") a Hong Kong entity which owns and operates the company's web sites and mobile apps; and which until recently owned the trademarks.

## GENERAL ALLEGATIONS: SHEIN IS A FAST FASHION BEHEMOTH THAT THRIVES THROUGH IRREDEMABLE INTELLECTUAL PROPERTY THEFT.

**A.     Shein is a "big tech" success story.**

17.     Just seven years ago, few people had heard of Shein. At that time, it was a small Chinese-based seller of bridal clothing (although it has never sold to Chinese customers). It is unclear which entity operated that early business, and there is no indication that such entity or entities had any improper purpose. The brand

appeared on the radar of young American women fashion consumers sometime around 2016 or 2017, which appears to correspond to the introduction of the algorithm (which may itself have begun without featuring a systematic and continuous copyright infringement) offering a rapidly changing assortment of trendy and remarkably affordable clothing, shoes, accessories, and beauty products. In the most remarkable success story in the history of fashion, just a few years later, Shein is the world's largest fashion retailer with annual revenue approaching $30 billion. The company outsells it closest rivals H&M and Zara *combined*, and does so with no reliance on brick-and-mortar stores.[5]

18.     Shein's online distribution channels have performed just as impressively. In May 2021, the SHEIN Mobile App became the most downloaded shopping mobile application in the U.S. on both iOS and Android, overtaking even downloads of Amazon's mobile application. In May 2022, that same mobile application became the most downloaded mobile application in the U.S. in *any category*, outperforming both TikTok and Instagram. Earlier this year, the investment firm Piper Sandler surveyed 7,000 American teens about their favorite ecommerce sites and found that Shein trailed only Amazon. The company claims the largest slice—28 percent—of the US fast-fashion market.

19.     The Shein brand also shines brightly on social media, with over 29 million followers on Instagram, 7.1 million followers on TikTok and over 600,000 followers on Twitter. These accounts offer the brand additional opportunities to reach millions of consumers, without spending on traditional advertising. In

---

[5] Allegations regarding Shein's and Defendant' business, governance, and corporate structure are made on information and belief. This information and belief is based on extensive research including publicly available information, media reports, internet resources, LinkedIn personal profiles of employees, job recruiting resources, import/export records, and other lawsuits on file—and all information has been reasonably verified to the extent possible.

COMPLAINT

addition, Shein has recently emphasized its non-shopping site sheingroup.com, which has become something of a corporate propaganda site—often indirectly responding to new criticisms through policy and initiative announcements, such as its Sustainability Report, offered as response to public outcry regarding production and sourcing.

20.     Shein is only poised to grow and expand, having recently raised $1 billion to $2 billion in private funding, reportedly at the $100 billion valuation.

21.     Shein has accomplished all this, while selling $10 dresses, by being more of a big tech company than a traditional fashion company. Besides revolutionizing the apparel supply chain and micro-influencer marketing, Shein utilizes "big data" at the core of its design process.

22.     In fact, for all the public criticism of Shein (discussed in more detail below), the story of its sheer technological success is underreported. Shein became the world's top clothier through the deft use of artificial intelligence and an *algorithm*. That algorithm has handily bested every human attempt to consistently design desirable clothing. A new corporate apparel company can spend millions on trend forecasting firms, designers, and consultants—but obviously, none has achieved anything close to Shein's success. The high fashion world (and even the low fashion world) treats Shein and its customers as unsophisticated—but its profits are obviously the envy of the industry.

23.     American consumers have become addicted to the Shein apps because (in addition to the most advanced psychological manipulations) one can never finish scrolling through the trendy offerings, all of which are very available at their incredibly low prices. In this regard, the company adds *thousands of new products every day*. Sheng Lu, an associate professor of fashion and apparel studies at the University of Delaware, estimates that Shein's business model generated 20 times as

many new items as H&M or Zara in 2021.[6] It's been said that one can't finish scrolling Shein in the same way one can't finish Tik Tok.

24.     Scrolling is also particularly rewarding because the designs are *good*—even at that incredible volume. By every account, teens and young women have become accustomed to being wowed every day with the cutting-edge trendy design. If there's a trend emerging or entering the cultural zeitgeist, Shein is already on it before anyone has even realized it was developing. Shein openly boasts that it accomplishes this incredible feat through use of super-sophisticated technology, as opposed to the aesthetic prowess of its "designers." Certainly, Shein's designs being so good is due, in some degree, to intellectual property misappropriation. On information and belief, most of their merit derives from the minds of other designers, whose permission is never obtained or even sought. But whatever the reason, thousands of young women are scrolling through the Shein App at this very moment—for entertainment and education but also to perhaps spot a seven-dollar skirt or nine-dollar rug that can't be lived without.

**B.     Shein somehow manages to thrive despite grave criticisms.**

25.     As mentioned above, Shein is heavily criticized on a number of important fronts—but somehow escapes serious damage to its sales. One good recent summary of such issues is contained in the Congressional Issue Brief cited in Footnote 1. With respect to all these issues, Shein's apparent lack of concern and willingness to take a public relations hit mirrors its approach to intellectual property issues. More important to Plaintiffs, Shein's decision to absorb such damage is

---

[6] Wired reported last year that "Every single day, Shein updates its website with, on average, 6,000 new styles—an outrageous figure even in the context of fast fashion. Lu, the University of Delaware professor, found that in a recent 12-month period, the Gap listed roughly 12,000 different items on its website, H&M had about 25,000, and Zara had some 35,000. Shein, in that period, had 1.3 million.

COMPLAINT

unfortunately foist upon the designer whose work Shein steals—forever tainting an artist with a perceived relationship to a company criticized for lead in its clothing, slave labor, tax evasion, and the like. Such damages are difficult to recover in law, because they are difficult to quantify, and are seen as inherently speculative.

26.     Areas of concern include:

- **Forced Labor**. Shein cotton apparel sourcing practices appear to be in direct violation of the Uyghur Forced Labor Prevention Act. As Shein was denying wrongdoing, Bloomberg used high tech of its own to prove this transgression. In late 2022, the news organization used climate and weather signatures on cotton fabrics used in Shein's clothing to determine that they originated in Xinjiang. The Uyghur Forced Labor Prevention Act bans the use of Xinjiang cotton in imported clothing unless the supplier can definitively prove that the cotton was not a product of forced labor, a step that Shein has not taken.

- **Other labor violations**. Outside of concerns about forced labor, a 2022 investigation by Channel 4 found a pattern of labor practice violations at Shein-affiliated factories in Guangzhou. Reuters reported in 2021 that Shein made false statements and lacked disclosures regarding its labor conditions, in violation of the UK's Modern Slavery Act. A 2021 report from Public Eye, a Swiss Human Rights watchdog, described serious problems with workplace safety and working requirements, including working hours of about 75 hours a week with no overtime pay, in violation of Chinese labor law. The *Exposed* documentary includes hidden camera video of factory bosses strongarming low level workers into abusive working conditions.

11

COMPLAINT

- **Health hazards**. The environmental and health impacts of Shein products are also facing scrutiny. A media investigation found Shein clothing materials containing high levels of potentially hazardous chemicals, including lead, perfluoroalkyl (PFA), and phthalates. Health Canada tested a Shein jacket for toddlers and found it to have 20 times the amount of lead considered safe for children, while a purse contained over five times the accepted level for children.

- **Environmental impact**. The UN Environmental Program estimates that due to its high-volume output, the fashion industry is responsible for 10 percent of annual global carbon emissions, *more than all international flights and maritime shipping combined*. At its current rate of growth, the fashion industry's greenhouse gas emissions will surge more than 50 percent by 2030.  Shein and other fast fashion platforms are exacerbating this trend by supplying higher volumes of cheaply produced clothing. A Bloomberg report found that Shein products contain 95.2 percent new plastics rather than recycled materials, while the large volume of shipments and low reuse rate among Shein products increases textile waste. *Good on Yo*u, which ranks the environmental impact of fashion companies, gave Shein its lowest rating.

- **Tax avoidance**. One way Shein bests its competitors on price is by use of questionable tax avoidance schemes. Shein's ultimate parent company operates in the tax haven of the Cayman Islands. At the operations level, Shein characterizes its small inexpensive consumer orders as going directly from China to the consumer. Under the "de minimis" exception, Shein avoids import duties of about 10-14% for these small orders, a significant savings. Analysts from Morgan Stanley

calculate that its tax advantages allow the company to undercut its competitors' prices by between 15 and 20 per cent.

27.     As bad as these practices are in isolation, they are far worse in their totality. Shein's low prices—achieved through exploitative labor practices—effectively render Shein's clothing *disposable,* which fills landfills. It further destroys any second-hand market for its clothing, because it is impossible to beat Shein's original prices. These practices spur competitors to follow suit or lose market share, driving a race to the bottom. Indeed, Shein already has a prominent and wildly successful copycat rival, called Temu, which Shein has sued in U.S. District Court.

**C.      Shein regularly commits the most egregious intellectual property infringement—which is baked into its business model.**

28.     Intellectual property theft is also high on the list of public criticisms of Shein. Here's how the Congressional Issue Brief described the issue earlier this year, highlighting the Wall Street Journal's report of *fifty* pending intellectual property infringement suits.

> **Copyright infringement**. Shein and other Chinese e-commerce platforms and their suppliers have been met with numerous claims that they consistently violate U.S. IP law, with the Wall Street Journal reporting in 2022 that Shein in particular had over 50 outstanding federal cases over three years levied against it alleging trademark or copyright infringement. In a June 2021 case, AirWear International, the parent company of shoe seller Dr. Martens, filed a lawsuit against Shein for its alleged "clear intent to sell counterfeits" and for copying the company's designs. Complaints and cases against Shein range from major U.S. designers and retailers like Ralph Lauren to independent artists who claim Shein suppliers have used their designs on Shein clothing without permission. Independent designers who earn more of their income online are particularly vulnerable, as they have fewer resources with which to pursue legal action against Shein and its suppliers.[7]

---

[7] Citing to *Good on You*, "Shein," March, 2023. https://directory.goodonyou.eco/brand/shein. Dan (footnote

continued)

COMPLAINT

29.     Although its details and precise methods are secrets, it's possible to infer certain facts about Shein's algorithm by looking at its results. For example, it's impossible not to notice that Shein's process often generates products that are *exact copies* of the work of other designers: occasionally large ones, but more often than not independent leading designers such as Plaintiffs. These designers are just the sort who might be producing the most cutting-edge designs—and being able to identify them is the gold standard of a trend forecasting company. They are also the designers least likely or to be able to fight back, including through legal action.

30.     Without investigation, it's impossible to say how the Shein algorithm produces its results—how a design for a blanket or overalls finds its way from a designer's modest website to being cut and sewn in a sweatshop in Guangzhou, to then be offered for sale online (with millions of eager eyes waiting) for a price far below the original designer's *costs*.

31.     The carbon copy infringements that are the subject of this lawsuit perfectly illustrate this illicit process. And many similar examples can be found in the many other lawsuits against Shein clogging the federal courts; as well as designers legitimately venting their grievances on social media. Further—because Shein likely works hard to quickly settle cases before they are public—Plaintiffs allege on information and belief that there are many more instances of such copying that are so far not publicly known. In all of these cases, it would have been easy

---

Strumpf, "China's Fast-Fashion Giant Shein Faces Dozens of Lawsuits Alleging Design Theft," Wall Street Journal, July 3, 2022; https://www.wsj.com/articles/chinas-fast-fashion-giant-shein-faces-dozens-of-lawsuits-alleging-design-theft-11656840601; The Fashion Law, "Shein Owner Zoetop Claims Dr. Martens Trademarks Are Generic," October 26, 2021; https://www.thefashionlaw.com/in-response-to-airwair-lawsuit-shein-owner-zoetop-claims-dr-martens-trademarks-are-generic/; Dan Strumpf, "China's Fast-Fashion Giant Shein Faces Dozens of Lawsuits Alleging Design Theft," Wall Street Journal, July 3, 2022; https://www.wsj.com/articles/chinas-fast-fashion-giant-shein-faces-dozens-of-lawsuits-alleging-design-theft-11656840601.

enough for Shein to appropriate 95% of the aesthetic appeal of any of these works by working assiduously (as other knockoff artists do) to change the designs "just enough" to avoid copyright liability. Yet still, Shein's process systematically yields an exact copy, time and again. These brazen copies constitute counterfeiting and piracy, under relevant copyright and trademark statutes and related case law.

32.    The only viable explanation for the brazenness of Shein's knockoffs is Shein's policy to knowingly accept, tolerate and even encourage and facilitate such misappropriation—as has been at least obliquely reported in some of the media accounts, like this documentary or this summary. Shein's design process targets smaller-scale designers in a way that simply disregards whether it generates an infringing copy, even an exact one, when it borrows from their work. Given the scale of Shein's design and production machine (generating 6000 new styles per day), the only way the algorithm could work (and as has been widely reported), is if very little information is communicated to the Shein "designers" —to the extent that humans are even involved—and factories other than the bare information about what the output should be. In other words, little or nothing is transmitted to Chinese factories beyond the original design itself.[8] This approach, together with other aspects of the algorithm, guarantees that the infringements will occur.

33.    Top mainstream apparel makers rely on the talent and creativity of their designers—who might very well openly take inspiration from independent

---

[8] On information and belief, and as a matter of business necessity, Shein's software contains little more that simple design specifications that help the person producing the goods execute new orders quickly. While a big brand might need a very high-end designer, or a designer with top technology and assistants, and even then, may only be able to produce a handful of styles in a month, Shein's "design" work (to the extent that the human component of such work could be called "design") could be executed even by someone untrained and unskilled. Were it otherwise, the cost calculus of the business model would not work.

COMPLAINT

designers, whose work might be shown at corporate design meeting or affixed to an "inspiration board" (physical or digital). Shein employs the sweatshop and creativity-free version of such a design process. In such iteration, there is no time for human creativity when small factories in China need to pump out six thousand new styles every day, on top of producing existing styles. Even if the algorithm "tries" to alter designs when it can, it often generates an exact copy as a matter of business necessity, as an artifact of the algorithm.

34.    Shein's intellectual property compliance is handled in a similar way. Most fashion companies, use a common-sense method of avoiding intellectual property liability: they instruct their designers not to copy; they conduct computerized searches to verify that such instruction is heeded; and they have lawyers on hand to run "clearance" searches, review new products, and ask and answer any tough questions about how close is too close for a knockoff, or about fair use, substantial similarity, or likelihood of confusion.

35.    Shein's method is different: When the algorithm spits out a design, which is likely to be an infringement, it produces very small quantities of the item for sale. For each new product sold on Shein's website, the initial production run is as low as 100-200 units per SKU, compared to the thousands of pieces typically produced by traditional peer retailers. Shein then offers the goods for sale via its online channels, where millions of young people are waiting to look and purchase— and waits to see if anybody complains that the design was stolen. If the algorithm generates an exact copy of a Nike product, alarm bells will ring at that company's brand protection vendor. Shein will hear about the matter quickly and will "cease and desist" as instructed. From there, the case then settles after negotiation and perhaps litigation regarding damages. A strong corporate plaintiff like Nike will likely command a significant settlement—leveraging Shein's exposure to enhanced damages for counterfeiting; indirect profits for the benefits derived from simply

COMPLAINT

having the garment for sale; and perhaps statutory damages for willful infringement. But even if the settlement is considerable and far exceeds realized profits on a particular garment, it baked in as a tolerated cost of doing business.

36.     When Shein copies a small or independent designer, the most likely outcome (without brand protection specialists and specialized software on the lookout) is that the infringement will go unnoticed. Under those circumstances, Shein reaps all the benefits of stealing and featuring the design that its technology had identified as valuable enough to take: it makes sales and keeps it customers' eyes glued to the Shein site and app for that much longer. And if customer demand justifies it, the item is reordered, and more are sold (now that the coast has been determined to be clear).

37.     Sometimes, even a small-scale independent designer is alerted to the infringement—perhaps because a customer or friend happens to see it—and complains to Shein. In these cases, Shein quickly apologizes, blames an unnamed third party for the misconduct, and reports (often but not always accurately) that sales were shockingly low. Given that sales were negligible, and because the transgression was not Shein's fault after all, Shein might offer a very small settlement. Further, it might make such offer in a way that makes further negotiation seem doomed to fail. In Ms. Perry's case discussed above, Shein made its offer as if it were a mom-and-pop operation rather than one of the richest enterprises in the world. Under the circumstances, accepting $500 can seem like a win.

38.     If the designer is lucky enough to be steered to an attorney who will take his or her case (often a family or friend referral, or business lawyer who handles corporate or licensing matters for the designer), Shein, again, will report, correctly or incorrectly, that (1) the lawyer has had the bad luck of happening upon a case with almost no sales or profits, to the point where a fair profits-based settlement is hardly worth pursuing; and (2) that the actual misconduct was

17                                                    COMPLAINT

committed by another company, which will be duly punished. Shein will also offer an apology and a vague explanation that makes it seem that this was an anomaly: somehow Shein got its wires crossed and produced a very small number of exact copies of the designer's goods. If it feels it has an advantage with respect to an overmatched plaintiff's counsel, Shein might assert that international sales/profits cannot be recovered under any circumstances. As with unrepresented parties, nine times out of ten the designer's counsel will accept what's offered, or bargain for just a little bit more.

39.     This testing-the-waters approach is an efficient and effective manner for Shein to avoid or minimize liability for infringement—while at the same time reaping the benefits of direct profits through sales, as well as the indirect benefits of featuring products identified as highly desirable and in vogue. Unfortunately, this business model is quite damaging to the independent designers whose work is misappropriated, like Plaintiffs here—who suffer the harm whether they mount a fight or not. For an up-and-coming talented designer—of exactly the sort that Shein's algorithm might target as worthy of copying—Shein misappropriating a key piece and offering it for sale at its typical rock-bottom price (achievable based on questionable labor practices), can be devastating. It might, for example, largely destroy the value of the item most responsible for driving a collection and interest from sales representatives and store buyers (not to mention consumers). For all the Plaintiffs in this action, Shein's offering exact copies of their goods for sale has led to financial damages.

40.     Shein makes no secret of its approach of offering very small numbers of very many products—although it doesn't highlight it as a way of avoiding intellectual property liability. Indeed, rather than trying to hide an approach that is easily observed, Shein touts the methodology as an integral part of its revolutionary pro-sustainability production process. The idea is fairly simple by high-tech

COMPLAINT

standards: Shein maintains that the point is to offer a few of each product to test consumer demand. Shein calls the idea of testing the waters with respect to a given product "the large-scale automated test and reorder (LATR) model," which it describes as if it were advanced systems science designed to reduce waste and environmental impact:

> For each new product sold on SHEIN's website, the initial production run is as low as 100-200 units per SKU, compared to the thousands of pieces typically produced by traditional peer retailers.
>
> We then use algorithms to gauge customer interest in real-time and provide feedback to our supplier partners, empowering them to increase or stop production based directly on market demand. We embrace a data-driven test and learn approach to improve efficiency and minimize production waste.
>
> As an e-commerce-only retailer, SHEIN avoids the need for overproduction typically associated with filling physical storefronts and prevents much of the waste and environmental impacts associated with running a traditional retail store. Through our unique on-demand business model we are able to consistently limit excess inventory to single digits, a percentage that is quite different than traditional retailers and one that results in substantially less waste.

41.     On information and belief, what Shein does not tell consumers is that LATR is in fact a method of facilitating intellectual property theft, as described above. Part of Shein's business model is copyright and trademark infringement. It has settled an untold number of cases—and the funds required to do so are tolerated as an easily absorbed cost of doing business. When generating sales of $24 billion in a year—Shein could easily tolerate hundreds of millions in settlements before it would consider jettisoning the model that necessarily produces the infringements along with the profits. In other words, if left unchecked, Defendants and Shein will continue to greatly damage the careers of the independent U.S. designers whose ideas it misappropriates (and continue to ignore related Congressional inquiries).

42.     This is not to say that Shein pays settlements to all comers, in whatever amount they demand. Rather, a further integral part of the business model and

enterprise is the legal machinery put in place to minimize the cost of those settlements. This takes many forms, from disguising its size and sophistication as mentioned above, to jurisdictional skirmishes or other threshold battles that demonstrate to would-be plaintiffs that it might just be easier to settle than fight— especially because such scenarios are usually coupled with (1) claims of surprisingly low profits on the particular item in question, and (2) an offer of judgment, which actually put the designer in financial jeopardy if he or she refuses to settle. What Shein rarely does is fight on the ground that they have not infringed.

**D.**   **Shein is not a single integrated entity as it portrays itself—rather, it is an association-in-fact of a decentralized constellation of entities, designed to improperly avoid liability.**

43.    So far, for convenience, this complaint has referred to the wrongdoer as "Shein," as if it were a single business unit. That makes sense, because this is how Shein refers to itself; and how the entire world refers to and thinks of Shein. And indeed, there's no obvious reason for Shein to adopt a structure other than the traditional parent-and-subsidiary model used by virtually every other similar international retailer, including Shein's fast fashion rivals.

44.    Shein seems to go out of its way to portray itself in this unitary manner. Their site Sheingroup.com bolsters this idea, especially after having been outed as sprawling enterprise in other lawsuits and in the media. Shein refers to "Shein's mission" and "our story"—and one can even click on a link for "corporate governance" (which leads to a page having nothing to do with corporate governance). The site speaks of Shein's "vision," and refers to its "offices" and the "Shein workplace." It refers to "our employees," and claims to have 10,000 of them, serving 150 countries. Customers are referred to various links at the domain Shein.com (legal@shein.com). Across its web sites, apps, policies, contractual terms

and press releases, Shein refers to its entire enterprise as "Shein," including the following recent or current examples:

- "SHEIN is made up of unique individuals who believe that fashion brings dignity to world, and hold true to the mission of making the beauty of fashion accessible to all."
- "From the United States to Singapore, SHEIN serves 150 countries in over 20 languages, dedicating ourselves to delivering the best customer experiences, built by our family of SHEIN . . ."
- "From our global offices, we reach customers in more than 150 countries."
- "Since SHEIN was founded in 2012, we have worked tirelessly toward our primary mission: making the beauty of fashion accessible to all."
- "SHEIN was founded in 2012 and has since grown to a team of nearly 10,000 employees selling to more than 150 countries."

45.    Shein also carefully presents itself as an *integrated* company—with all vital functions being performed in a vertically integrated structure. For example, while Shein sometimes (when trying to avoid liability) likes to refer to its manufacturers and designers as outside and independent of the brand as a whole, it more commonly speaks of the "company" as doing its own design and logistics, including the following recent and current examples:

- To meet demand, we have built a fully digital supply chain that seamlessly and quickly delivers products to our customers worldwide. We use proprietary software to track sales and communicate with our factories in real time to order in small batches. Our digital supply chain is the core of our business model and empowers us to offer a wide range of on-trend styles without creating excessive inventory waste or making customers wait weeks for their orders to be fulfilled.

COMPLAINT

- Since SHEIN was founded in 2012, we have worked tirelessly toward our primary mission: making the beauty of fashion accessible to all. Throughout the past decade, we developed tools to help us fulfill that goal — by implementing automation to optimize production efficiency and our supply chain, we were able to provide customers with an affordable range of hyper-trendy styles.

- We believe that our workforce should mirror the diversity and creativity of our customers, which is why we set up local operations in key markets to build authentic connections with our global consumer base.

- We are working to assess the impact of SHEIN's business — socially and environmentally — at all levels of our value chain. As we take ownership of SHEIN's impact in the world, we can seize opportunities to use the company as a driver for social good, leveraging the SHEIN Cares Fund to support organizations tackling critical issues, financially supporting fashion entrepreneurs and investing in emerging technologies to reduce our environmental impact and make circularity a reality.

- SHEIN is a digital first fashion and lifestyle e-tailer with key operation centers in Singapore, China, the U.S. and other major global markets.

46.   And indeed, as described above, and despite its de facto decentralized structure (as described below), Shein is in fact an *integrated* enterprise—which succeeds in part because it is tied together (from design to production to distribution to sales) with common technology and a common business scheme. Indeed, Shein is often thought of as a marvel of modern corporate integration.

47.   Despite these claims and self-portrayals, extensive research reveals that there really is no one central entity called Shein. There is no one company

COMPLAINT

employing 10,000 people. Rather, "Shein" is a loose and ever-changing (though still continuous even as some individual elements might change to be replaced by others) association-in-fact of entities and individuals (the "Shein Enterprise" or simply "Shein"). As explained below, this structure minimizes, and was intended to minimize, exposure to liability and blame, including liability for intellectual property infringement.

48.    An influential BBC Channel 4 documentary exposing some of Shein's practices (called "Inside the Shein Machine", available here) explains: "**When you start to look behind that, at who is the company, it's a big black hole**." This assertion is backed up by extensive research. A recent and now-settled counterfeiting lawsuit against Shein brought by a prominent streetwear brand, supported by impressive and thorough research, came to a similar conclusion—and tied the corporate shell game that is Shein to the specific goal of wrongfully avoiding or minimizing liability for its wrongdoing, including copyright infringement:

> Despite diligent research, it appears there is no registered entity named "Shein"; however, on information and belief, Defendants have operated together under the name "Shein" and have been able to get away with trademark and copyright infringement for years by using empty corporate shells to serve as litigation targets. In addition to shamelessly stealing the intellectual property of others and prolifically creating cheap knockoffs at great profit for themselves, Defendants have purposely set up a situation where they obfuscate jurisdiction and hide behind multiple shell companies from various jurisdictions, in effect creating a corporate shell game.

49.    As one news article has reported, "The corporate structure of Chinese fast-fashion giant Shein is opaque and tax-optimized, and ownership is unclear. A multitude of brands make the group even less tangible." Opaque and tax-optimized:

COMPLAINT

Shein's Corporate Structure, Public Eye, 2022, (www.PublicEye.ch). To illustrate, the article offers the following schematic diagram of the Shein Enterprise:



50.     The chart accurately portrays the difficulty in pinning down exactly what Shein is. But in fact, the truth is far more complicated, as Plaintiffs' own research had revealed, confirming that Shein is a loose and overtly decentralized amalgamation of entities, as described below.

51.     One way in which the Shein Enterprise uses its byzantine structure to advantage is by making it impossible for intellectual property plaintiffs to figure out who to sue. Unrepresented parties face an utter brick wall. But even plaintiffs with attorneys, with strong cases, struggle to find an appropriate defendant. In the end, they simply sue whatever party they can find, and hope to straighten the matter out in discovery. Generally, this uncertainty imposes a hurdle to plaintiffs, by design exploited by Shein, who end up settling for less because they are not sure they have the correct party—and face daunting discovery against an entrenched defendant to try to find out.

24                                    COMPLAINT

52.     Indeed, if one searches federal dockets on Westlaw or Lexis for "Shein," one finds quite a few intellectual property infringement actions filed in the last few months—and there is certainly no clear consensus about whom to sue. Currently popular is Shein Distribution Corporation ("SDC"), a Delaware corporation—probably because it simply sounds like a proper defendant as a "distributor." But SDC is a new entity, formed in 2021, and does not appear to have an office or employees. Further, plaintiffs suing SDC face obstacles: On information and belief, Shein regularly tells plaintiffs suing SDC that foreign profits are absolutely off the table and will not be disclosed, and that SDC does not control whatever company is designing the clothing at issue.

53.     Many Shein lawsuits are filed against Zoetop Business Co., Limited, a Hong Kong limited company—but it appears that most plaintiffs choosing Zoetop are simply copying others in naming this entity, because it is difficult to find any tangible evidence of what this entity does. While suing Zoetop solves some of the problems identified, and perhaps attacks higher on the governing ladder, Zoetop can and has challenged personal jurisdiction, imposing another huge burden on plaintiffs facing expensive pleading challenges. For example, in a major action by a well-funded plaintiff with elite trial counsel, the parties fought endlessly over such a jurisdictional skirmish, which is arguably what led Shein/Zoetop to finally settle.

54.     Some of the most sophisticated recent Shein lawsuits now name what appears to be the highest level worldwide administrative unit Roadget Business Pte. Ltd., a private limited company organized in Singapore. When Shein filed its own IP litigation recently, against new rival and alleged copycat "Temu"— it did so under Roadget. Roadget would be a good choice as an infringement defendant because it can hardly claim lack of jurisdiction after it has sued here—but disclosing the Roadget entity was just another move designed to obscure who might be liable for Shein misconduct. When Roadget sued, it alleged that it is suing as the "the owner

of the famous SHEIN trademarks in the United States (and worldwide)," and as the "owner of the website located at https://us.shein.com and the corresponding mobile application", but never identifying itself as a traditional "parent company" or as a seller or distributor of Shein branded clothing.

55. In addition, Shein references mysterious other companies as being responsible for any actual infringements. A common initial defense offered by Shein, in response to a simple letter directly from an obviously aggrieved artist, is to claim that whatever entity was contacted is not the one who committed the infringement. Obviously, such suggestions are hard to square with Shein's boasts of an integrated company from cutting edge big-tech and "big data" style design mechanisms from to production to fulfillment.

56. Plaintiffs' research reveals that the Shein Enterprise includes the following entities. On information and belief, each (and certainly each Defendant) is aware of the general nature of the Shein Enterprise and its activities and that it extends beyond their individual roles. Defendants conduct or participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

- **Defendant Shein Distribution Corporation ("SDC")**. This is a new company, as of 2021, which was created to act as Shein's domestic operating company. A review of job listings in various spaces such as Google and LinkedIn reveals that SDC now operates (or at least hires for) most of the administrative functions of the overall Enterprise in the United States. SDC now recruits and employs lawyers, accountants, and related Information Technology workers. On information and belief, SDC provides designer services ancillary to the designing of clothing for the Shein Enterprise, such as creation of advertising materials and campaigns.

- **Guangzhou Shein International Import & Export Co Ltd**. This Chinese based company is involved in export, production, and design of Shein goods.

COMPLAINT

On information and belief, it sits at the top of a hierarchy of lower-level Chinese production entities and contractors. Guangzhou is an entity that exports Shein-branded goods from China into United States, even though its name does not appear on direct-to-consumer purchases.

- **Roadget Business Pte. Ltd** ("Roadget"); Business Pte. Ltd., 12 Marina Boulevard, #15-01, Marina Bay Financial Centre, Singapore 018982. As mentioned, Roadget is another relatively new company, this one based in Singapore. Roadget is the direct parent of Guangzhou Shein International (identified above). Reuters has reported that Shein expects to move resources (including as many as 200 employees) to Roadget from China, in an effort to escape the stigma of being a Chinese company like TikTok. Roadget is currently advertising for government relations associates as well as for staff for human resources, marketing and IT. Roadget is the owner of the Shein trademarks in the United States (and worldwide) and now owns the website located at https://us.shein.com and the corresponding mobile application.

- **Zoetop Business Company, Limited, ("Zoetop")** a Hong Kong entity which owns and operates the company's web sites and mobile apps; and which until recently owned the trademarks.

- **Romwe.** Romwe is a separate apparel brand, apparently a sister "company" to Shein. It operates similarly, and it is not immediately apparent why the brand is presented separately, or its precise relationship to the other entities.

- **Nanjing Top Plus Information Technology Co Ltd**., a Chinese operating company that is Shein's primary business in China.

- **Mr**. **Xu** (and his leadership group).

- **Shein Fashion Group Inc**. ("SFG"), located in the City of Industry, has been the primary U.S. importer of goods sold as Shein (where such goods are not shipped directly to the consumer from a foreign entity), and is thus a

distributor of those goods. U.S. customs records show a high volume of imports received by SFG from Guangzhou Shein International Import & Export.

- **Style Link Logistics, LLC**. This entity provides some of Shein's logistics and fulfillment services in the United States.

- **Beauty of Fashion Investment.** This holding company based in the British Virgin Islands tax haven is the secretive ultimate parent of Shein—and its where all the money goes (according to the Swiss investigative journalism site Public Eye). Almost nothing is known about this entity. On information and belief, Mr. Xu is either president or holds a similar office in Beauty of Fashion Investment.

- Shein's primary UK corporate entity is Zenith Business Company.

- SHEIN Distribution UK Ltd. operates the Shein site and apps, and sells products offered there under license from Roadget.

- **The Chinese production entities**. It has been reported that Shein uses hundreds of clothing manufacturing facilities in Guangzhou, China, in order to make its items at such a fast rate. But these are not independent companies—but rather very much exist under the Shein umbrella—and are tied together and take direction from Guangzhou Shein International Import & Export Co Ltd. Producers rely heavily on the other side of Shein's impressive high-tech platform, this one producer-facing. Shein boasts about these entities being part and parcel of its overall enterprise: "Our supply chain is made up of a third-party supplier community that we support with physical enhancements to facilities, technology innovations, and training. But it does not stop there. We take our responsibility one step further, with initiatives that empower and support the family members of workers within our supplier community."

COMPLAINT

- **The Shein law firms**. An integral part of the Shein business model is the minimization of liability for the intellectual property infringements it plans to commit (as systematic results of Shein's design process). Part of this liability-avoidance is accomplished by the Defendants' use of the decentralized nature of the enterprise as a whole. But in addition, Shein relies on its small roster of law firms to impose obstacles on plaintiffs—the particulars of which depend on the facts of the case, the legal acumen of plaintiff or plaintiff's counsel, which entity has been sued, and any other relevant considerations—after which a settlement is always reached. The obstacles rarely involve fighting the case on the merits, but might rather include extensive discovery battles; (on information and belief) representing that sales of the offending item(s) are extremely low, whether or not that is true; offering apologies and false explanations about independent companies who are the true culprits; preliminary pleading or jurisdictional challenges—all designed to cause fighting the case to be that much more expensive and long before the merits are reached. On information and belief, the Shein Law Firms have honed and repeatedly pursue, unmeritorious legal positions and approaches to wrongfully withholding information, and imposing wrongful obstacles to hearing of intellectual property cases on their merits.

- **The Shein marketplace participants**. Although they are rarely mentioned, Shein apparently acts as an "marketplace" in some respects, allowing "independent" third parties to sell on its platform, in the manner of Amazon. Shein mentions nothing about acting as a marketplace in its corporate literature, including sheingroup.com. In the past month, however, a Shein spokesperson reportedly blamed several new and particularly egregious infringements on impliedly independent marketplace sellers. Shein was recently accused of selling knockoff Nike Air Jordan sneakers. They were

again literally exact copies—missing only the iconic Jumpman logo. A spokesperson for Shein reportedly blamed an outside retailer, stating, "Shein takes all claims of infringement seriously and we have removed the product in question. Third-party sellers are required to comply with our Shein Marketplace policies and certify their products do not infringe IP."

57.     On information and belief, the Defendants recognize the liability exposure for their obvious counterfeiting and willful and criminal infringing activities and, therefore, have gone to great lengths to disguise themselves and their corporate relationships, and their use of Shein enterprise, so as to avoid liability for wrongdoing. On information and belief, Shein's leadership creates entities designed to allow the wrongdoers to avoid liability and challenge U.S. jurisdiction over them.

58.     On information and belief, Defendants each is or was each one of the owners and/or operators of the Shein websites and/or Shein mobile apps, and/or the supplier of products to the Shein websites and/or Shein mobile apps, or is otherwise involved with the manufacture, sale, or distribution of infringing products as herein alleged. These companies are doing business in and committing the acts of infringement and other wrongful acts alleged herein in the Central District of California and within the State of California, and is directing its activities towards persons in this state and knowingly causing damage to Plaintiffs in this state.

**E.      Defendants use the decentralized nature of the Shein Enterprise to avoid liability.**

59.     One case, pending before Judge Gutteriez until settled in 2020 is another example (among many) of individual participants in Shein using the enterprise's formally decentralized nature to make it more difficult and expensive for a plaintiff, with a clearly meritorious case, to recover. In that case, the plaintiff

COMPLAINT

alleged a simple and obvious infringement by Shein, against SFG and Zoetop.[9] Defendants, and the enterprise as a whole, largely avoided liability. Zoetop, which could not be served except under Hague, was found to be a necessary party. And the only proper party before the court, according to Shein, was SFG, which Shein pointed out "does not own, operate, or control the website www.shein.com, it books no revenues from the website, and it did not make, sell, offer for sale, process returns of, or otherwise distribute the allegedly infringing t-shirt." In other words, there was no one to recover from due to Shein's multiplicity of entities—even though the infringement was clear and even though Shein takes in virtually unlimited money from American consumers. On information and belief, these are regular and recurrent practices employed by the Shein Law firms to defend individual components of the Shein Enterprise, as required in a given case.

60.     2020 was long ago in the history of Shein and the individual entities mentioned above. In fact, some of the most prominent entities that are now part of the Shein Enterprise (such as SDC and Roadget) did not yet exist in 2020. Further, Judge Gutierrez was obviously not made aware of many of the facts alleged and explained here. In fact, rather than disclose important facts, Shein made an ambitious attempt to seize the moral high ground, which in this case worked:

> Plaintiff, apparently a self-appointed crusader against Chinese fast fashion companies, wants to avoid having to serve Zoetop pursuant to The Hague Convention, of which Hong Kong is a member. It wants to hold Defendant Shein Fashion Group, Inc. ("SFG"), a California entity, liable for the t-shirt that was sold off of Zoetop's website.

61.     This single sentence of argument is a prime example of Shein using its multiplicity of entities to avoid liability. If that case had gone on (i.e., if an exhausted plaintiff hadn't settled), Shein would have argued that Shein Fashion Group (which is to be distinguished of course from Shein Distribution Corporation)

---

[9] *Cat Coven, LLC v. Shein Fashion Group, Inc*., 2:19-CV-07967.

had nothing to do with the design on the t-shirt in question—which might technically have been true given the corporate structure. Shein went on to explain its 2020 version of how things worked *in a way that as a practical matter would leave no entity obviously liable*.

> SFG performs marketing services for Zoetop in the United States and undoubtedly has a relationship with Zoetop. But it does not own, operate, or control the website www.shein.com, it books no revenues from the website, and it did not make, sell, offer for sale, process returns of, or otherwise distribute the allegedly infringing t-shirt. Regardless, SFG is not asking for a finding of no liability in its Motion to Dismiss; instead, SFG's Motion only seeks to join Zoetop so that SFG's rights (and Zoetop's) will not be impaired.

The matter settled not long after Judge Gutierrez dismissed the case against Zoetop.

62.    Ms. Perry's experience is another case in point. Perhaps Shein really does delegate simple copyright disputes to local Chinese representatives—but whether they do or not, the net result is that most artists would simply take the $500 (as Ms. Perry did) rather than attempt to communicate with an agent. In other words, the far-flung nature of the Shein business, and its lack of visibility and transparency, leads to lower to settlement numbers on a systematic basis. The fact there is not one entity to hold accountable makes it all the easier to frustrate those with legitimate claims.

63.    If one spends time reviewing dockets, there are no shortage of such examples—of Defendants using Shein's confusing corporate structure and its asserted decentralized nature to avoid liability, and even to avoid disclosing basic information. As mentioned, Shein regularly argues that whatever entity is being sued does not have access to information held by the company responsible for design. On information and belief, liability avoidance is a primary purpose of employing such structure—and Shein multiplies the effect by changing the entities on a regular basis (while maintaining overall continuity by simply making replacements, such as Roadget for Zoetop, making pursuit of a legitimate remedy all

the more difficult. Further, even where Shein's law firms cannot credibly argue that no defendant is liable, it can throw up legal roadblocks, meritorious or not, to make recovery all the more difficult and all the more expensive—inevitably leading to a lesser settlement than if Shein employed a traditional corporate structure.

64.    Besides improperly refusing to disclose information, research on prior cases also reveals that, on information and belief, Shein is not above out-and-out deception—which is rendered easier by its decentralized nature. Recently, Levi's alleged that Shein, after agreeing to cease selling a certain design, and changing the items shown for sale on the Shein website in a mutually agreeable manner, a test purchase revealed that Shein was in fact still selling the original infringing product. Further, on information and belief, in case after case, Shein will represent that all arguably infringing products have been identified—only to have additional infringing items discovered later if the plaintiff somehow has the resources to track them down. On information and belief, this sort of deception is simply easier when it can be blamed on a smaller business unit.

65.    Shein's multiplicity of entities and decentralization also aid in efforts to use its LATR approach, explained above, to avoid liability for intellectual property infringement. Again, waiting to see if anyone complains or sues, as a method of intellectual property compliance, works better when fingers can be pointed elsewhere. For example, when LATR yields a copyright or trademark cease and desist letter or lawsuit, Shein first line of defense generally couples removing the product from its sites with blaming the misconduct on another actor (implying such actor is independent). While unrepresented parties and most unsophisticated attorneys assume this other company is fully independent of the entity being sued, it doesn't much matter that experienced attorneys understand that the culprit is a company under the same general umbrella. The methodology is equally effective.

## First Claim for Relief for Copyright Infringement

### (By Perry, Against All Defendants)

66.     Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

67.     Ms. Perry created the design "Make it Fun." Not long after, Ms. Perry discovered that both Shein.com and Romwe.com (a related web site, she leaned) were selling brazen copies of one of Ms. Perry's designs. After she complained through contact forms on the web sites ("I noticed that Shein has been selling my work as both wall art and phone cases without my permission or approval. It is incredibly disheartening, insulting, and downright evil to profit off of artists without their knowledge or permission"), an agent at the email address copyright@shein.com offered to pay her $500, without release or settlement language. The offering was apparently on behalf of both Romwe and Shein; and directed Ms. Perry to collect her $500 by invoicing a company called "Zoetop," which she of course had never heard of.  Curiously, Shein handled the negotiations in badly translated, robotic English—quite different than the corporate persona under which they offer their highly polished public relations communications.:

> SHEIN very much respects IP rights of any third parties. …. From our initial investigation, this product bearing the disputed design was not produced by our company, they were bought as finished goods from a local vendor in a large art painting and accessory market in China. We did request our suppliers to provide us with only non-infringement products. Besides, before we display the product on our website, we take necessary measures to check the print and text and did not find any IP records, given the method we use. In this respect, we did our diligence to avoid any IP violation. We will check more thoroughly in the future. [¶' Thanks for your kindly inform and please let us know shall you have any further questions.

68.     "Make It Fun" is an original artwork first created by Perry in 2016, with its date of first publication September 1, 2018. Perry applied to the copyright office and received registration for the Artwork on May 1, 2023, with registration number VA 2-344-429.

34                                              COMPLAINT

69.   After Perry's creation of the "Make It Fun" artwork and (on information and belief) with full knowledge of Perry's intellectual property rights in the artwork, Defendants infringed Perry's artwork by making and selling a mechanical copy of Perry's artwork, as seen below (Perry's copyrighted artwork on the left and Shein's infringing copy being sold on its website, on the right):



70.   Defendants continued to willfully infringe this copyrighted design by selling a mechanical, infringing copy of the "Make It Fun" artwork, even after Perry contacted Defendants.

71.   All of Defendants' acts were performed without Perry's permission, license, or consent. Defendants' infringement was particularly egregious in it was willful and undertaken for purposes of commercial advantage and private financial gain.

72.   As a result of Defendants' infringement, Perry has suffered and will continue to suffer substantial damage to her business in the form of diversion of trade, loss of profits, and a diminishment in the value of her designs and art, her rights, and her reputation; all in amounts that are not yet ascertainable but not less than the jurisdictional minimum of this court. As a result of Defendants' misconduct

COMPLAINT

as alleged herein, Perry's reputation as a designer and her career has been irreparably tarnished, diminishing the value of her works, and decreasing revenue derived from her work.

73.     By reason of its infringement of Perry's copyrighted design as alleged herein, Defendants are also liable to him for the actual damages he has incurred as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

## Second Claim for Relief for Copyright Infringement

## (By Perry, Against All Defendants)

74.     Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

75.     The following year, Ms. Perry was contacted by Shein (and Romwe) to request to license her work for use on its clothing. The request declared that it was being made by the websites.

> Hello Perry, My name is iris, representing SHEIN.com and ROMWE.com. … We are looking to work with aspiring artists like yourself and create capsule collections with your work! We think your art will be a big hit with our global consumers on both platforms. Combined, SHEIN and ROMWE have over 20 million followers and consumers worldwide. This is a great opportunity to showcase the world who you are and your art!

76.     The email went on to describe what sounded like significant money to be made. Rather than sell out and accept this money, Ms. Perry flatly declined the invitation without mincing words, showing just how detrimental an association with Shein can be:

> How dare you contact me after my artwork has been stolen and the hard time I was put through with the people at Shein to resolve it. This email disgusts me. Shein and Romwe have stolen artwork from both myself and many of my hardworking friends and colleagues. Your business practices are ethically and morally so wrong and I want nothing to do with your company. I want to be perfectly clear: Never contact me again. Your businesses have no reason to exist at this point and I hope they burn to the ground. You had your chance years ago to "showcase" my art by properly purchasing it instead of blindly selling it for your own gain.

36                                                          COMPLAINT

77.     Ms. Perry then signed off with a prescient prediction: "Never contact me again — but who knows maybe we'll be in touch because I'm sure it isn't the last time my hard work will be used without my knowledge or consent." And here we are.

78.     In August 2020, Ms. Perry created the design "Floral Bloom" to be fabricated as a blanket, which went on sale on October 21, 2020. Not long after Perry's blanket went on sale, she discovered that Shein was selling an identical knock off version. Fortunately, Ms. Perry was steered to a lawyer who knows how to handle her case—but otherwise she, or even most lawyers, would have accepted any minimal sum as compensation due to uncertainty about how to properly seek more appropriate remedies.

79.     "Floral Bloom" is an original design first created by Perry in 2020, with its date of first publication October 21, 2020. Perry applied to the copyright office and received registration for the Artwork on May 1, 2023, with registration number VA 2-344-753.

80.     After Perry's creation of the "Floral Bloom" design and (on information and belief) with full knowledge of Perry's intellectual property rights in the artwork, Defendants infringed Perry's artwork by using a mechanical copy of Perry's pattern on an identical throw blanket as the one Perry sells, as seen below:



81.     Defendants continue to willfully infringe this copyrighted design by continuing to sell the infringing throw blanket with a mechanical copy of the "Floral

COMPLAINT

Bloom" design.

82.     All of Defendants' acts were performed without Perry's permission, license, or consent. Defendants' infringement was particularly egregious in it was willful and undertaken for purposes of commercial advantage and private financial gain.

83.     As a result of Defendants' infringement, Perry has suffered and will continue to suffer substantial damage to her business in the form of diversion of trade, loss of profits, and a diminishment in the value of her designs and art, her rights, and her reputation; all in amounts that are not yet ascertainable but not less than the jurisdictional minimum of this court. As a result of Defendants' misconduct as alleged herein, Perry's reputation as an artist and designer and her career has been irreparably tarnished, diminishing the value of her works, and decreasing revenue derived from her work.

84.     By reason of its infringement of Perry's copyrighted artwork as alleged herein, Defendants are also liable to him for the actual damages he has incurred as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

### Third Claim for Relief for Copyright Infringement
### (By Baron, Against All Defendants)

85.     Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

86.     "Trying My Best" is an original artwork first created by Baron in 2016, with its date of first publication on November 16, 2016. "Trying My Best" is an original work protected by copyright law. Baron applied to the copyright office and for registration for the artwork on May 3, 2017. Plaintiff has complied in all respects with the Copyright Act and all other laws governing copyright. Plaintiff has complied with 17 U.S.C. § 411 in that the deposit, application, and fee required for

COMPLAINT

1   registration have been delivered to the Copyright Office in proper form, and

2   registration has been refused.

3       87.    After Baron's creation of the "Trying My Best" artwork and (on

4   information and belief) with full knowledge of Baron's intellectual property rights

5   in the artwork, Defendants infringed Baron's artwork by selling a mechanical copy

6   of the "Trying My Best" artwork, as seen below:



7

8

9

10

11

12

13      88.    Defendants continued to willfully infringe Baron's his copyright by

14  continuing to sell the infringing, mechanical copy of "Trying My Best" on

15  Defendants' websites.

16      89.    All of Defendants' acts were performed without Baron's permission,

17  license, or consent. Defendants' infringement was particularly egregious in it was

18  willful and undertaken for purposes of commercial advantage and private financial

19  gain.

20      90.    As a result of Defendants' infringement, Baron has suffered and will

21  continue to suffer substantial damage to his business in the form of diversion of

22  trade, loss of profits, and a diminishment in the value of his Art, rights, and

23  reputation; all in amounts that are not yet ascertainable but not less than the

24  jurisdictional minimum of this court. As a result of Defendants' misconduct as

25  alleged herein, Baron's reputation and career has been irreparably tarnished,

26  diminishing the value of his works, and decreasing revenue derived from his work.

27      91.    By reason of its infringement of Baron's copyright as alleged herein,

28                                          39                          COMPLAINT

Defendants are also liable to him for the actual damages he has incurred as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

### Fourth Claim for Relief for Copyright Infringement

### (By Blintz, Against All Defendants)

92.     Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

93.     Blintz created the design "Orange Daisies" on October 23, 2018, and the first garment using the "Orange Daisies" design was offered for sale on July 28, 2019, a pair of overalls with the Orange Daisies pattern.

94.     Soon after, Blintz discovered Shein selling overalls with a pattern identical to her "Orange Daisies" pattern.

95.     "Orange Daisies" is an original design created by Blintz, with its date of first publication July 28, 2019. Blintz applied to the copyright office and received registration for the Artwork on April 27, 2023, with registration number VA 2-343-963.

96.     After Blintz's creation of the "Orange Daisies" design and (on information and belief) with full knowledge of Blintz's intellectual property rights, Defendants infringed Blintz's artwork by making and selling a garment with a mechanical copy of Blintz's artwork, as seen below (Blintz product with copyrighted design, left; Shein's product with mechanical copy of pattern right):




COMPLAINT

97.    Defendants willfully infringe Blintz's copyrighted design by selling a mechanical, infringing copy of the "Orange Daisies" artwork.

98.    All of Defendants' acts were performed without Blintz's permission, license, or consent.

99.    As a result of Defendants' infringement, Blintz has suffered and will continue to suffer substantial damage to her business in the form of diversion of trade, loss of profits, and a diminishment in the value of her designs and art, her rights, and her reputation; all in amounts that are not yet ascertainable but not less than the jurisdictional minimum of this court. As a result of Defendants' misconduct as alleged herein, Blintz's reputation as an artist and designer and her career has been irreparably tarnished, diminishing the value of her works, and decreasing revenue derived from her work.

100.   By reason of its infringement of Blintz's copyrighted design as alleged herein, Defendants are also liable to him for the actual damages he has incurred as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

**Fifth Claim for Relief for Trademark Infringement (15 U.S.C. § 1114)**

**(By Baron, Against All Defendants)**

101.   Plaintiffs incorporate by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

102.   Through Baron's use in commerce of the phrase and graphic "Trying my Best," shown above, the public has come to associate that mark with Baron and his products. Further, the public has come to understand the mark as an indicator that Baron is the source of the goods bearing the mark.

103.   Baron's trademark "Trying My Best" was registered by the United States Patent and Trademark Office on January 9, 2018, on the principal register, and thereafter maintained, with Serial Number 87-745,875. Plaintiff remains the

COMPLAINT

current holder of the mark. Defendants' use of the "Trying My Best" trademark is likely to cause confusion, deception, and mistake by creating the false and misleading impression that Shein's goods are manufactured, associated with or connected with Baron, or have the sponsorship, endorsement, or approval of Baron.

104.   Defendants' use of the "Trying My Best" trademark is identical to Baron's federally registered mark in violation of 15 U.S.C. § 1114, as seen below:



105.   Defendants' activities are causing and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to Baron's goodwill and reputation.

106.   Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Baron's mark to Baron's great and irreparable harm.

107.   Defendants caused and are likely to continue causing substantial injury to the public and to Baron, and Baron is entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

**Sixth Claim for Relief for Violation of the Racketeer Influenced and Corrupt**

**Organizations Act**

**18 U.S.C. §§ 1962(c) and 1964(c)**

**(By all Plaintiffs, Against All Defendants)**

108.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 87, above, as though fully set forth at length.

109.   What has been referred to in the Complaint as "Shein" is an enterprise engaged in and whose activities affect interstate commerce, as described above. Beginning at various times from approximately 2017 through the filing of this Complaint, in the Central District of California and elsewhere, Defendants (and/or their functional predecessors) associated with the Shein Enterprise, engaging in activities which affect interstate commerce. The Enterprise is made up of the persons, entities, and associations that include those listed above—and likely additional participants that Plaintiffs have not yet discovered despite diligent efforts. As described above, Defendants had a role in the using the Enterprise to conduct racketeering activity that was distinct from the undertaking of those acting on its behalf. Defendants also attempted to benefit, and did benefit, from the activity alleged herein, and thus was not a passive victim of racketeering activity, but an active perpetrator.

110.   Pursuant to and in furtherance of their scheme, Defendants committed acts that constitute a pattern of racketeering activity and have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern (including multiple related acts) of racketeering and activity described herein.

111.   Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful and purpose of intentionally and criminally infringing Plaintiffs' and others' copyrights for massive financial gain. Defendants were able to sell infringing clothing, on a systematic basis, with minimum interference or hindrance, as a result of its engaging in a pattern of such activity alleged to have been undertaken by certain of the entities and persons making up the Shein Enterprise. For example,

SDC is able to reap the benefits described above—including selling a huge volume of clothing to consumers, sometimes infringing and sometimes not—in part because of its participation in the greater enterprise, which provides the necessary "design," production, transportation, import/export administration and execution, other logistics, fulfillment and returns processing and support, and legal cover/defense, provided by other elements of the Shein Enterprise or the enterprise as a functional integrated whole. The Shein Enterprise, although a labyrinthine association-in-fact as described herein, is distinct from each of its constituents and distinct from each Defendant, as described herein—and also exists to carry out the formidable tasks of operating the world's largest clothing business. The Shein Enterprise performs many of the functions that might typically be performed by a global parent company controlling national or regional subsidiaries—a corporate structure that Shein eschews because of the benefits described herein of an overtly decentralized structure

112.   The Shein Enterprise constitutes a group of persons associated together for the common purpose of operating the Shein overall business, which includes as an integral part, a systematic and continuous pattern of criminal copyright infringement, as alleged in detail above. Each part of the overall enterprise has a role—that is interrelated with the other involved entities and their roles—that is vital to the whole and in fact facilitates the workings including the criminal copyright infringement of the whole. For whatever reasons, the individual cogs in the Shein Enterprises sometimes change form and identity and place of formation. But ignoring these changes, there is a relationship and longevity between the parts of the whole that facilities, the workings of the Shein Enterprise, including the integral criminal copyright infringement. In fact, bringing entities and associations in and out of existence is designed to facilitate the workings of the Enterprise, including its racketeering. The fact that some of the Defendants did not exist as recently as

2021—yet the consumer-facing workings of the Shein Enterprise remain largely unchanged—demonstrates that the Shein Enterprise has a real existence distinct from Defendants and its other constituents. Further, as alleged above and as further alleged on information and belief, defendants formed constituents of the Shein Enterprise as an informal ongoing organization that functions as a continuing unit, that is in fact centrally controlled by Mr. Xu and his leadership group (as opposed to being the mere result of cooperation or conspiracy among separate actors). Such structure, although outwardly decentralized is highly effective and controlled, as can be shown by its ongoing associations that functions as a continuing unit.

113.   The Shein Enterprise focuses its efforts on the United States and exists in and affects U.S. interstate commerce. As mentioned, it systematically infringes, in the most egregious manners, against U.S. independent designers. And on information and belief, the U.S. market is its chief sales outlet. Further, the operations of the Shein algorithm focus on finding designs (often infringing designs) likely to succeed in the U.S. Market.

114.   Each of the Defendants participated in a pattern of racketeering activity, as alleged above, including instances of copyright infringement, constituting criminal copyright infringement, for which each defendant is culpable, chargeable, indictable, or otherwise punishable, in violation of 18 U.S.C. § 1962(c). With the enactment of the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 3, 110 Stat. 1386 ("ACPA")], Congress added criminal copyright infringement (18 U.S.C. § 2319) to the statutory list of RICO predicate acts found in 18 U.S.C. § 1961(1)(B). The copyright infringement alleged herein is properly deemed "criminal" and "egregious" in that, it was willful and undertaken for purposes of commercial advantage and private financial gain, all in violation of 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater particularity in the foregoing paragraphs. It is willful in the sense that Defendants,

like other constituents of the Shein Enterprise, knew it would occur and expected it to occur, and had the specific intent that it would occur, as an integral part of the overall business model. Again, there is no way that the Shein overall business model can function other than as described, which necessarily includes criminal copyright infringement.

115.   Such predicate acts are part of a pattern, in that they have occurred systematically and continuously over time in prior years and continue unabated today. The Shein leadership, who ultimately control many of the entities that comprise the Shein Enterprise, have no intention to cease operating in the manner described herein. For example, each of the four instances of copyright infringement alleged in this action are part of a pattern, especially when combined with other cases that have been filed in this and other federal courts. These cases include two brought by Plaintiffs' counsel in the Central District:

- *Stark v. Shein Distribution Corporation*; Case #: 2:22−cv−06016 JAK (AFMx), filed 8/24/22, currently pending before Judge Hsu.
- *Cookies v. Shein Distribution Corporation* Case #: 2:22−cv−07998-JFW-AGR, filed 11/2/22, pending before Judge Walter.

116.   The pattern is also exemplified by most of the many others filed against Shein in recent months and years (including the fifty current cases mentioned by Congress in its Issue Brief, citing the Wall Street Journal), and including many that are cases currently pending around the country:

117.   Defendants' predicate acts of criminal or egregious copyright infringement are obviously closely related, in the ways described herein, including that they fall within the Shein Enterprise's typical algorithm-based business model and blame-avoidance and liability-avoidance techniques. As such, these related and continuous predicate acts of criminal copyright infringement make up a continuous pattern and pose a threat of continued criminal activity. In fact, it appears certain

46                                      COMPLAINT

that unless restrained by law or otherwise checked in some significant way, the Shein enterprise is only growing, and its acts of criminal copyright infringement are increasingly in frequency.

118.    Indeed, it is also certain, as described above, that a significant number of the tens of thousands of new garments that Shein will post for sale in the next few days will be improper and illegal exact copies of the work of other designers, constituting criminal copyright infringement. The pattern began as soon as the Shein Enterprise adopted its business model and systematic use of its algorithm or its predecessors, as described above, which was, on information and belief, in 2017 or 2018, which certainly constitutes a pattern extending over a substantial period. In addition, on information and belief based on the nature of the enterprise and predicate acts alleged above, there is a threat of continuing criminal activity extending indefinitely into the future.

119.    Each Defendant knowingly committed criminal copyright infringement, as described above. Each played its role, described above, with full knowledge of the overarching criminal copyright infringement it participates in, as well as that of the Shein Enterprise, and its role in the overall Shein Enterprise. Each defendant intended to engage in the criminal copyright infringement described herein, with actual knowledge that the conduct was illegal. More specifically, each of the Defendants are liable for producing, selling, offering for sale, distributing, and promoting exact copies of Plaintiffs' protected works.

120.    Plaintiffs have suffered injury, as alleged above—including losing profits that were instead realized by members of the Shein Enterprise, and suffering lost sales of the copied items and other items sold as part of their businesses, as a direct result of the conduct here attributed to each Defendant. Specifically, each Plaintiff was an intended "victim" of Shein's business model of freely, knowingly, and exactly copying garments and other items. Having such replica goods in the

marketplace can be devastating to a young designer—especially when (as one would expect to often be the case and is indeed the case here, with respect to each Plaintiff) the item in question represents a key product in the development of each Plaintiff's line and business. In other words, Shein's and Defendants' algorithm is designed to, and effectively does, select exactly those items to copy that would be successful in the marketplace, for either the respective Plaintiff or for Shein and Defendants. Such injuries occurred by reason of, and as a proximate cause of, the alleged conduct of the Defendants and the Shein Enterprise as a whole.

121.   The pattern described is of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5) and presents both a history of criminal conduct and a distinct threat of continuing criminal activity. This activity consists of multiple acts of racketeering and criminal copyright infringement by Defendants, is interrelated, not isolated, and is perpetrated for the same or similar purposes by the same persons, includig Mr. Xu and the Shein leadership. This activity extends over a substantial period of time, up to and beyond the date of this Complaint. These activities occurred after the effective date of 18 U.S.C. §§ 1961 et seq., and the last such act occurred within 10 years after the commission of a prior act of racketeering activity.

122.   Plaintiffs have been injured in his/her/their business or property as a direct and proximate result of the Defendants and the other enterprise members' violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

123.   As a result of the violations of 18 U.S.C. § 1962(c), by Defendants, Plaintiffs has suffered substantial damages, in an amount to be proved at trial. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorneys, fees, incurred by reason of Counter-defendants' violations of 18 U.S.C. § 1962(c).

COMPLAINT

124.   As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property as described herein.

**PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.     That each Plaintiff is awarded all damages, including future damages, that Plaintiff has sustained, or will sustain, due to the acts complained of herein, subject to proof at trial;

2.     That each Plaintiff is awarded their costs and expenses in this action;

3.     That each Plaintiff is awarded his attorneys' fees;

4.     For an order permanently enjoining Defendants and their employees, agents, servants, attorneys, representatives, successors, and assigns, and all persons in active concert or participation with any of them, from engaging in the misconduct referenced herein;

5.     Injunctive relief, as appropriate, to prevent further racketeering activity

6.     That Defendants be ordered to file with this Court and serve upon Plaintiffs' counsel within thirty (30) days after services of the judgment demanded herein, a written report submitted under oath setting forth in detail the manner in which they have complied with the judgment;

7.     For disgorgement of all proceeds, and restitution of the moneys wrongfully received by Defendants as the result of their wrongful conduct;

8.     That each Plaintiff is awarded punitive damages in an amount sufficient to deter Defendants, and each of them, from their wrongful conduct;

9.     For payment of treble damages to each Plaintiff pursuant to 18 U.S.C. § 1964(c); and

10.    For further relief, as the Court may deem appropriate.

COMPLAINT

DATED: July 11, 2023                   ERIKSON LAW GROUP

By:    ___/s/_____
          David A. Erikson
Attorneys for Plaintiffs

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on its claims on all issues triable by a jury.

DATED: July 11, 2023                    ERIKSON LAW GROUP

By:     /s/
David A. Erikson
Attorneys for Plaintiffs

COMPLAINT