**GLUCK LAW FIRM**
Jeffrey S. Gluck (SBN 304555)
 Jeff@Gluckip.com
16950 Via De Santa Fe
Rancho Santa Fe, CA 92067
Telephone: 310 776 7413

ANTOINETTE WALLER - State Bar No. 152895
awaller@wpdslaw.com
**WOOLLS PEER DOLLINGER & SCHER**
A Professional Corporation
12401 Wilshire Blvd., Second Floor
Los Angeles, CA 90025-1089
Telephone: (213) 629-1600
Facsimile: (213) 629-1660

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| KRISTA PERRY, an individual; LARISSA MARTINEZ an individual; JAY BARON an individual; RACHEL PFEFFER, an individual; DIRT BIKE KIDZ, Inc., a California corporation; ESTELLEJOYLYNN, LLC, a New Jersey limited liability company; JESSICA LOUISE THOMPSON SMITH, an individual; LIV LEE, an individual; <br><br> Plaintiffs, <br><br> v. <br><br> SHEIN DISTRIBUTION CORPORATION, a Delaware corporation; ROADGET BUSINESS PTE., LTD; ZOETOP BUSINESS CO., LTD.; SKY XU, a/k/a CHRIS XU; and GEORGE CHIAO. <br><br> Defendants. | Case No. 2:23-cv-05551-MCS-JPR <br> Hon. Mark C. Scarsi <br><br> **THIRD AMENDED COMPLAINT** |

1102992.1

Plaintiffs Krista Perry, Larissa Martinez, Jay Baron, Rachel Pfeffer, Dirt Bike Kidz, Inc., Estellejoylynn, LLC, Jessica Louise Thompson Smith and Liv Lee ("Plaintiffs") hereby bring this complaint against Defendants Shein Distribution Corporation; Roadget Business Pte., Ltd; Zoetop Business Co., Ltd.; Sky Xu (a/k/a Chris Xu), and George Chiao ("Defendants").

## I.     INTRODUCTION

1.      According to its website, sheingroup.com, "SHEIN is a global online fashion and lifestyle retailer with a mission to make the beauty of fashion accessible to all." SHEIN also claims to have offices in 19 countries, to serve 150+ markets, to employ 11,000 people, and to collaborate with 4,600 designers and artists. SHEIN states that it is headquartered in Singapore with "key centers of operation around the world, including the U.S., Brazil, Ireland, and Southern China." SHEIN further represents that it "has key offices in the [sic] Los Angeles, Sao Paulo, Dublin, Guangzhou, Paris, Washington, D.C., London, and Singapore." When this Complaint refers to SHEIN, it refers to the entity described on the website, sheingroup.com.

2.      For all the scrutiny given to TikTok, it is surprising that Congress has not considered more dramatic action against the Chinese fast-fashion giant SHEIN. The brand sells more clothing than any other in the world; and recently raised $2 billion in capital at a staggering $66 billion valuation. Like TikTok, SHEIN's business model depends on collecting a shocking amount of data from its customers—which it then reverse-engineers into fashion trends. SHEIN is actually a greater societal threat than TikTok—because it contributes mightily to serious problems beyond data security and privacy, such as environmental damage, sweatshop (or worse) labor conditions, tax avoidance, child safety, as well as the subject of this lawsuit, large-scale and systematic intellectual property theft from

U.S. designers large and small.[1] Worse, there is every worry that the SHEIN high-tech business model, described below, will spread and lead other industries on a race to the bottom.

3.      One wonders why what is effectively the world's third most valuable private company doesn't do more to shed its outlaw status.[2] Nike devotes unlimited resources to avoiding any hint of sweatshop conditions or other supply chain scandals—while SHEIN somehow survives grave reports of slave labor and unsafe children's clothing. As explained below, it turns out that avoiding direct blame is another key aspect of SHEIN's business model, as its decentralized structure often allows it to plausibly redirect blame. More to the point, SHEIN's widely discussed misconduct generates enough upside that it is worth the public relations damage. So far, "bad press" has obviously not taken SHEIN down. Excited "microinfluencers" still extoll the virtues of their $100 "#sheinhaul,"[3] even as they come out firmly

---

[1] Congress has indeed recognized the dangers posed by SHEIN. In April, it issued a stinging rebuke to the brand in the form of an "Issue Brief" detailing some of the same problems described here, "including exploitation of trade loopholes; concerns about production processes, sourcing relationships, product safety, and use of forced labor; and violations of intellectual property rights." Reading through the Brief, however, reveals that even Congress was stymied in its attempts to gather all relevant information, especially about the corporate structure of SHEIN and who to hold accountable. Due to this factual vacuum, in February 2023, Senators Bill Cassidy (R-LA), Elizabeth Warren (D-MA), and Sheldon Whitehouse (D- RI) wrote to SHEIN's secretive founder Sky Xu, demanding information on some of these same issues, within thirty days. On information and belief, SHEIN has thus far ignored the request. The same lack of information is apparent in media accounts. There is no shortage of SHEIN exposés in major news publications—but none of them contain anything close to a full factual story about who and what SHEIN is and how it operates. Plaintiffs were forced to engage in extraordinary research to gather the allegations presented here, because their cases involve eventually proving facts relating to the closely guarded secrets of SHEIN's design process and labyrinthine corporate structure.

[2] SHEIN would be among the world's top three most valuable private companies—along with SpaceX and Byte-Dance, the owner of TikTok—if it were in fact one company. But as discussed below, there is no single company that can be identified as SHEIN. Rather, it is a dizzying and ever-changing decentralized amalgamation of companies—and it is this structure that facilitates the intellectual property misappropriation that is the impetus for this action.

[3] A search of #sheinhaul on social media reveals one of the brand's most effective forms of organic viral marketing—which conveniently bypasses the traditional media in bringing the messages of young consumers to other young consumers. SHEIN sends $100 worth of apparel (which might be fifteen pieces, produced at a trivial cost) to a small-time influencer to gush as they unpack and try on new treasures. The practice is even more effective when carried out by an army of aspiring micro-influencers who hope to add followers as a result of a #sheinhaul video, as SHEIN strongly encourages them to do.

THIRD AMENDED COMPLAINT

1102992.1

against overflowing landfills. When news hit of SHEIN selling Swastikas; or Muslim prayer rugs being sold as decorative "mats;" or necklaces with the word Allah in Arabic being sold with others reading "baby girl" and "scorpio," SHEIN gets away with little more than comically token explanations and apologies.[4]

4.      But this case is only tangentially about SHEIN being a generally bad actor (although its imperviousness to criticism extends to and even bolsters its ability to engage in intellectual property theft, as explained below). In this lawsuit, eight independent designers allege that SHEIN produced, distributed, and sold *exact* or close copies of their creative work. As shown below, these are not the familiar "close call" legal claims where a corporate apparel manufacturer takes inspiration a bit too liberally. At issue here, inexplicably, are true copies of copyrightable graphic design appearing on Plaintiffs' products.

5.      When they first saw SHEIN's copies, Plaintiffs were as surprised as they were outraged. Why would SHEIN go to the trouble of precisely duplicating their work —when it would be easier and obviously less problematic to simply closely knock them off as other corporate apparel companies often do? But again, as it turns out, exact copying is part and parcel of SHEIN's "design" process and organizational DNA. As alleged in detail below, and as Defendants knew and directly and willfully pursue, SHEIN's design "algorithm" could not work without generating the kinds of exact or close copies that can greatly damage an independent designer's career—especially because SHEIN's artificial intelligence is smart enough to misappropriate the pieces with the greatest commercial potential. In other words, Defendants built an algorithm purposefully designed to unearth and then misappropriate the most valuable asset an independent designer might have: commercially valuable designs. Understanding how and why requires unraveling

---

[4] SHEIN also maintains a glossy public relations site, touting its good citizenship. The brand is often accused of greenwashing some of most serious problems. In late June, a scandal resulted from SHEIN's courting of influencers with all-expenses-paid trips to China to view a "typical" factory, as reported by the New York Times.

SHEIN's revolutionary business model, which is in some ways brilliant (as evidenced by the handful of new billionaires it has minted among its founders), but unfortunately also inherently causes some of the high-profile externalities mentioned above, including systematic intellectual property theft. The deeper one digs into SHEIN's business model, the more it becomes clear that a pattern of systematic criminal intellectual property infringement is baked in from the very beginning.

6.      There is no Coco Chanel or Yves Saint Laurent behind the SHEIN empire. Rather, there is a mysterious tech genius, Sky Xu  (a/k/a Chris Xu), about whom almost nothing is known. He made SHEIN the world's top clothing company through high technology, not high design. The brand has made billions by creating a secretive algorithm that astonishingly determines nascent fashion trends—and by coupling it with a corporate structure, including production and fulfillment schemes, that are perfectly executed to grease the wheels of the algorithm, including its unsavory and illegal aspects. To the uninitiated, the consumer-facing aspects of the model are utterly unfamiliar. Thousands of new items are offered for sale *every day*, for prices low enough to render the garments truly disposable. Yet even at this incredible volume and low price point, enough of SHEIN's pieces are so up-to-the-minute trendy as to keep armies of young people eagerly combing through the App for potential purchases. This is a daily activity for SHEIN fans, like browsing Tik Tok or Instagram. This is, of course, a retailer's dream—customers shopping your App on a regular basis as an enjoyable pastime—which quickly translates to billions of dollars in value.

7.      If SHEIN's intellectual property theft and blame avoidance is facilitated by its byzantine shell game of a corporate structure, and the willingness of its control group to commit systemic and repeated infringements, as alleged in detail below, there is one legal regime that might provide the remedies necessary to combat such well-organized wrongs distributed across an array of related actors and

4                    THIRD AMENDED COMPLAINT

entities: the civil prong of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, which was designed to address the misconduct of culpable individuals who use others (i.e., enterprises) to commit crime. It is well established that egregious copyright infringement (of the type alleged here, and of the type referenced in other similar cases against SHEIN) constitutes racketeering—pursuant to a 2005 act of Congress adding "criminal infringement of a copyright" to RICO's definition of "racketeering activity." SHEIN also employs a scheme to defraud customers and designers as a regular way of doing business and that scheme is dependent upon SHEIN's use of the U.S. Mail and interstate and foreign wires. Further, and as mentioned, SHEIN's misconduct is committed not by a single entity, but by a de-facto association of individuals and entities. And just as intended by Congress, the same decentralization that facilitates SHEIN's criminal infringement and other racketeering activity, renders the operators or managers of SHEIN, such as Defendants, liable under civil RICO. Further, SHEIN has grown rich by committing individual infringements over and over again, as part of a long and continuous pattern of racketeering, which shows no sign of abating. There is no indication that SHEIN intends to slow down any time soon—and indeed their corporate literature speaks only of projected exponential growth. It is not an exaggeration to suggest that SHEIN's pattern of misconduct involves commission of new copyright and trademark infringements *every day*.

## II.    JURISDICTION AND VENUE

8.     This Court has original subject matter jurisdiction over this action and the claims asserted herein, under 18 U.S.C. § 1964. This is a civil action arising under 18 U.S.C. §§ 1961-1968, § 901(a) of Title IX of the Organized Crime Control Act of 1970, as amended, otherwise known as RICO, and specifically under 18 U.S.C. § 1964(c) and other causes of action as set forth hereafter. This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 ("federal question jurisdiction") and 1338(a)-(b) ("patent, copyright, trademark and unfair

competition jurisdiction") in that this action arises under the laws of the United States and, more specifically, Acts of Congress relating to patents, copyrights, trademarks, and unfair competition. Pursuant to Cal. Code Civ. Proc. § 410.10, each Defendant is subject to the personal jurisdiction of the Court because it (either itself or through agents) transacts business in, has agents in, or is otherwise found in and has purposely availed itself of the privilege of doing business in California and in this District, and because the alleged misconduct was directed to California and this district, and Defendants' marketing activities at issue in this case were expressly aimed at California residents (including promotional activities aimed at the West Coast and California apparel market). In addition, SHEIN and defendants have specifically directed sales and marketing activity towards California customers by operating a "pop up shop" in Los Angeles in 2022. Defendants are also subject to personal jurisdiction under the "effects test" in that each, with respect to the alleged acts of copyright infringement, (1) committed intentional acts (2) that were expressly aimed at the United States and California, and (3) that caused actual harm that the defendant knows is likely to be suffered in the United States and California.

9.      Pursuant to 18 U.S.C. § 1965(a), this Court also has personal jurisdiction over each Defendant who resides, is found, has an agent, or transacts his/her/its affairs in this district.

10.      To the extent any Defendant is found not to be subject to this Court's personal jurisdiction pursuant to 18 U.S.C. 1965(a), this Court may exercise personal jurisdiction over such Defendant pursuant to 18 U.S.C. § 1965(b) because the ends of justice require that the Court exercise personal jurisdiction over any defendant who claims not to have sufficient minimum contacts with the forum. Defendants have engaged in a multi-district conspiracy to defraud Plaintiffs and consumers. The Court has personal jurisdiction over at least one of the Defendants, and there is no other district that may exercise personal jurisdiction over all Defendants.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(3) because a substantial part of the events or omissions giving rise to the claims occurred in this District in that, *inter alia*, Defendants have expressly directed their marketing and promotional activities at consumers in Los Angeles.

### III.   PARTIES

12.     Plaintiff Krista Perry is an individual residing in Worcester, Massachusetts. Perry is a well-regarded and successful illustrator and designer living in Massachusetts. In 2015, she received an honors BFA in illustration from Massachusetts College of Art and Design. Since then, Perry has created artwork for clients like Madewell, Nickelodeon, and Jameson Whiskey.

13.     Plaintiff Larissa Martinez (aka Larissa Blintz) is an individual residing in Los Angeles County, California. Blintz is the CEO, creator, and owner of "Miracle Eye" a female-owned family-run small business, designing and fabricating ethically handmade-to-order clothing out of their workshop and store in Los Angeles.

14.     Plaintiff Jay Baron is an individual residing in Los Angeles County, California. He is a well-regarded independent artist working between Burbank, California and Austin, Texas. He founded Retrograde Supply Co. when he was 18 and has amassed a large social media following, with his work featured in television, film, and 100+ independent retailers in the United States.

15.     Plaintiff Rachel Pfeffer is an individual residing in Maryland. She is a well-regarded designer, selling her original works through her Etsy store "RachelPfefferDesigns," where she is a "Star Seller" with over 11,000 sales, and over 2,800 5-star reviews.

16.     Plaintiff Estellejoylynn, LLC ("EJL") is a New Jersey limited liability company, owned and operated by the mother/daughter team of Robin and Shannon Young. The Youngs are well-regarded jewelry and accessory designers whose original designs are sold at boutique retailers across the United States, as well as

through EJL's website and its Etsy store Estellejoylynn, where the company is a "Star Seller."

17.     Plaintiff Dirt Bike Kidz, Inc. is a California corporation founded by professional freestyle motocross rider and professional off-road truck racer Jeremy "Twitch" Stenberg and his wife Susan. It produces original action sports clothing and accessories under the Dirt Bike Kidz brand name. The company's Instagram account @dirtbikekidz boasts over 300 thousand followers, and Jeremy's YouTube channel has over 250 thousand subscribers.

18.     Plaintiff Jessica Louise Thompson Smith is an independent fashion designer and IATSE-affiliated costumer. Her original designs have become a favorite for high-profile celebrities, including musicians who commission her to design for their world tours; and her ready-to-wear collection is available through her website, and worldwide through select independent and specialty boutiques.

19.     Plaintiff Liv Lee is a highly regarded illustrator and designer based out of Sydney, Australia. Her work has appeared on products ranging from fine art prints to apparel; book covers to dinnerware; and has been commissioned by major brands, including L'Occitane, Gorman, and Anthropologie. Lee displays her work on her social media accounts and personal website, where she sells prints of her work directly to consumers internationally.

20.     Defendant Roadget Business Pte., Ltd ("Roadget") is a private Singapore Limited Company with no "operating parent company." Roadget is the owner of the SHEIN trademarks in the United States (and worldwide) and owns the website located at https://us.shein.com and the corresponding mobile application.

21.     Defendant Shein Distribution Corporation ("SDC") is a Delaware corporation formed in April 2021 and registered to do business in California on May 25, 2021. In Secretary of State filings, SDC represents that its principal office address is 757 S. Alameda Street, Suite 220, Los Angeles, California. SDC's "indirect operating parent" is Roadget. Since August 1, 2021, SDC has sold

products to U.S. consumers through the website https://us.shein.com and the corresponding mobile app, which it operates pursuant to a license from Roadget. SDC sells, products in categories ranging from apparel (women's, men's, and children's), footwear, home goods, and accessories.

22.  Defendant Zoetop Business Co., Ltd., ("Zoetop") is a private Hong Kong company with "no operating parent." Until July 31, 2021, Zoetop sold products to U.S. consumers and worldwide through the website https://us.shein.com.

23.  Defendant Sky Xu (a/k/a Chris Xu) ("Xu") is identified as a founder and the CEO of SHEIN on the website http://sheingroup.com/our-business/our-business-model/. According to news media, Xu's office is located at the Marina Bay Financial Centre in Singapore. Xu was born in Zibo, China. His birthname is Xu Yangtian. Xu initially established SHEIN in Nanjing, where he tapped into the southern manufacturing base of Guangzhou.

24.  Defendant George Chiao ("Chiao") is the President of SDC and oversees the company's operations and human resources. Chiao is also the President of Shein Technology LLC ("Shein Tech") and the manager of Style Link Logistics LLC ("Style Link"). Shein Tech and Style Link are part of SHEIN. When filing documents with the Indiana Secretary of State on behalf of SDC and Shein Tech, Chiao states that his address is 757 S. Alameda Street, Suite 220, Los Angeles, California, but in documents filed with the Indiana Secretary of State of behalf of Style Link, Chiao states that his address is 5400 E. 500 S., Whitestown, Indiana.

## GENERAL ALLEGATIONS

### SHEIN IS A FAST FASHION BEHEMOTH THAT THRIVES THROUGH IRREDEEMABLE INTELLECTUAL PROPERTY THEFT

**A.  SHEIN is a "big tech" success story.**

25.  Just seven years ago, few people had heard of SHEIN. At that time, it was a small Chinese-based seller of bridal clothing (although it has never sold to

1102992.1

Chinese customers). It is unclear which entity operated that early business, and there is no indication that such entity or entities had any improper purpose. The brand appeared on the radar of young American women fashion consumers sometime around 2016 or 2017, which appears to correspond to the introduction of the algorithm (which may or may not itself have begun featuring systematic and continuous copyright infringement) offering a rapidly changing assortment of trendy and remarkably affordable clothing, shoes, accessories, and beauty products. In the most remarkable success story in the history of fashion, just a few years later, SHEIN is the world's largest fashion retailer with annual revenue approaching $30 billion. The company outsells it closest rivals H&M and Zara *combined*, and does so with no reliance on brick-and-mortar stores.[5]

26.     SHEIN's online distribution channels have performed just as impressively. In May 2021, the SHEIN Mobile App became the most downloaded shopping mobile application in the U.S. on both iOS and Android, overtaking even downloads of Amazon's mobile application. In May 2022, that same mobile application became the most downloaded mobile application in the U.S. in *any category*, outperforming both TikTok and Instagram. Last year, the investment firm Piper Sandler surveyed 7,000 American teens about their favorite ecommerce sites and found that SHEIN trailed only Amazon. The company claims the largest slice—28 percent—of the U.S. fast-fashion market.

27.     The SHEIN brand also shines brightly on social media, with over 29 million followers on Instagram, 7.1 million followers on TikTok and over 600,000 followers on Twitter. These accounts offer the brand additional opportunities to reach millions of consumers, without spending on traditional advertising. In

---

[5] Allegations regarding SHEIN's and defendants' business, governance, and corporate structure are made on information and belief. This information and belief is based on extensive research including publicly available information, media reports, internet resources, LinkedIn personal profiles of employees, job recruiting resources, import/export records, and other lawsuits on file—and all information has been reasonably verified to the extent possible.

10                          THIRD AMENDED COMPLAINT

addition, SHEIN has recently emphasized its non-shopping site sheingroup.com, which has become something of a corporate propaganda site—often indirectly responding to new criticisms through policy and initiative announcements, such as its Sustainability Report, offered as response to public outcry regarding production and sourcing.

28.     SHEIN is only poised to grow and expand, having recently raised $2 billion in private funding.

29.     SHEIN has accomplished all this, while selling $10 dresses, by being more of a big tech company than a traditional fashion company. Besides revolutionizing the apparel supply chain and micro-influencer marketing, SHEIN utilizes "big data" at the core of its design process.

30.     In fact, for all the public criticism of SHEIN (discussed in more detail below), the story of its sheer technological success is underreported. SHEIN became the world's top clothier through the deft use of artificial intelligence and an *algorithm*. That algorithm has handily bested every human attempt to consistently design desirable clothing. A new corporate apparel company can spend millions on trend forecasting firms, designers, and consultants—but obviously, none has achieved anything close to SHEIN's success. The high fashion world (and even the low fashion world) treats SHEIN and its customers as unsophisticated—but its profits are obviously the envy of the industry.

31.     American consumers have become addicted to the SHEIN apps because (in addition to the most advanced psychological manipulations) one can never finish scrolling through the trendy offerings, all of which are very available at their incredibly low prices. In this regard, the company adds *thousands of new products every day*. Sheng Lu, an associate professor of fashion and apparel studies at the University of Delaware, estimates that SHEIN's business model generated 20 times

as many new items as H&M or Zara in 2021.[6] It's been said that one can't finish scrolling SHEIN in the same way one can't finish Tik Tok.

32.    Scrolling is also particularly rewarding because the designs are *good*—even at that incredible volume. By every account, teens and young women have become accustomed to being wowed every day with the cutting-edge trendy design. If there's a trend emerging or entering the cultural zeitgeist, SHEIN is already on it before anyone has even realized it was developing. SHEIN openly boasts that it accomplishes this incredible feat through use of super-sophisticated technology, as opposed to the aesthetic prowess of its "designers." Certainly, SHEIN's designs being so good is due, in some degree, to intellectual property misappropriation. On information and belief, most of their merit derives from the minds of other designers, whose permission is never obtained or even sought. But whatever the reason, thousands of young women are scrolling through the SHEIN App at this very moment—for entertainment and education but also looking for a seven-dollar skirt or nine-dollar rug that can't be lived without.

**B.    SHEIN somehow manages to thrive despite grave criticisms.**

33.    As mentioned above, SHEIN is heavily criticized on a number of societally and politically important fronts—but somehow escapes serious damage to its sales. The brand manages to escape damage to its sales for the same reason—almost as if becoming the bad boy or corporate fast fashion has become a virtue. Hopefully, it is not one that will be emulated (although it already has been by Temu, as explained below). This is one good reason why SHEIN is dangerous. One recent summary of such issues is contained in the Congressional Issue Brief cited in Footnote 2. With respect to all these issues, SHEIN's apparent lack of concern and willingness to take a public relations hit mirrors its approach to intellectual property

---

[6] *Wired* reported in 2022 that "Every single day, SHEIN updates its website with, on average, 6,000 new styles—an outrageous figure even in the context of fast fashion. Lu, the University of Delaware professor, found that in a recent 12-month period, the Gap listed roughly 12,000 different items on its website, H&M had about 25,000, and Zara had some 35,000. SHEIN, in that period, had 1.3 million.

issues. More important to Plaintiffs, SHEIN's decision to absorb such damage is unfortunately foist upon the designer whose work SHEIN steals—forever tainting an artist with a perceived relationship to a company criticized for lead in its clothing, slave labor, tax evasion, and the like. Such damages are difficult to recover in law, because they are difficult to quantify, and are seen as inherently speculative.

34.    Areas of concern include:

- **Forced Labor**. SHEIN cotton apparel sourcing practices appear to be in direct violation of the Uyghur Forced Labor Prevention Act. As SHEIN was denying wrongdoing, Bloomberg used high tech of its own to prove this transgression. In late 2022, the news organization used climate and weather signatures on cotton fabrics used in SHEIN's clothing to determine that they originated in Xinjiang. The Uyghur Forced Labor Prevention Act bans the use of Xinjiang cotton in imported clothing unless the supplier can definitively prove that the cotton was not a product of forced labor, a step that SHEIN has not taken.

- **Other labor violations**. Outside of concerns about forced labor, a 2022 investigation by Channel 4 found a pattern of labor practice violations at SHEIN-affiliated factories in Guangzhou. Reuters reported in 2021 that SHEIN made false statements and lacked disclosures regarding its labor conditions, in violation of the UK's Modern Slavery Act. A 2021 report from Public Eye, a Swiss Human Rights watchdog, described serious problems with workplace safety and working requirements, including working hours of about 75 hours a week with no overtime pay, in violation of Chinese labor law. The *Exposed* documentary includes hidden camera video of factory bosses strongarming low level workers into abusive working conditions.

- **Health hazards**. The environmental and health impacts of SHEIN products are also facing scrutiny. A media investigation found SHEIN clothing materials containing high levels of potentially hazardous chemicals, including

1102992.1

1  lead, perfluoroalkyl (PFA), and phthalates. Health Canada tested a SHEIN

2  jacket for toddlers and found it to have 20 times the amount of lead

3  considered safe for children, while a purse contained over five times the

4  accepted level for children.

5  • **Environmental impact**. The UN Environmental Program estimates that due

6  to its high-volume output, the fashion industry is responsible for 10 percent of

7  annual global carbon emissions, *more than all international flights and*

8  *maritime shipping combined*. At its current rate of growth, the fashion

9  industry's greenhouse gas emissions will surge more than 50 percent by 2030.

10  SHEIN and other fast fashion platforms are exacerbating this trend by

11  supplying higher volumes of cheaply produced clothing. A Bloomberg report

12  found that SHEIN products contain 95.2 percent new plastics rather than

13  recycled materials, while the large volume of shipments and low reuse rate

14  among SHEIN products increases textile waste. *Good on Yo*u, which ranks

15  the environmental impact of fashion companies, gave SHEIN its lowest

16  rating.

17  • **Tax avoidance**. One way SHEIN bests its competitors on price is by use of

18  questionable tax avoidance schemes. At the operations level, SHEIN

19  characterizes its small inexpensive consumer orders as going directly from

20  China to the consumer. Under the "de minimis" exception, SHEIN avoids

21  import duties of about 10-14% for these small orders, a significant savings.

22  Analysts from Morgan Stanley calculate that its tax advantages allow the

23  company to undercut its competitors' prices by between 15 and 20 per cent.

24  35.  As bad as these practices are in isolation, they are far worse in their

25  totality. SHEIN's low prices—achieved through exploitative labor practices—

26  effectively render SHEIN's clothing *disposable,* which fills landfills. It further

27  destroys any second-hand market for its clothing, because it is impossible to beat

28  SHEIN's original prices. Also, to the extent that SHEIN's bad practices are designed

14                    THIRD AMENDED COMPLAINT

to keep prices low—and they all are—they facilitate the intellectual property theft described in this lawsuit. In this way, the sum total of these practices is part of SHEIN's work to sell inexpensive clothing at incredible profits. These practices spur competitors to follow suit or lose market share, driving a race to the bottom. Indeed, SHEIN already has a prominent and wildly successful copycat rival, called Temu, which SHEIN has sued in U.S. District Court.

**C.    SHEIN regularly commits the most egregious intellectual property infringement—which is baked into its business model.**

36.    Intellectual property theft is also high on the list of public criticisms of SHEIN. Here's how the Congressional Issue Brief described the issue last year, highlighting the *Wall Street Journal*'s report of *fifty* pending intellectual property infringement suits.

> **Copyright infringement**. Shein and other Chinese e-commerce platforms and their suppliers have been met with numerous claims that they consistently violate U.S. IP law, with the Wall Street Journal reporting in 2022 that Shein in particular had over 50 outstanding federal cases over three years levied against it alleging trademark or copyright infringement. In a June 2021 case, AirWear International, the parent company of shoe seller Dr. Martens, filed a lawsuit against Shein for its alleged "clear intent to sell counterfeits" and for copying the company's designs. Complaints and cases against Shein range from major U.S. designers and retailers like Ralph Lauren to independent artists who claim Shein suppliers have used their designs on Shein clothing without permission. Independent designers who earn more of their income online are particularly vulnerable, as they have fewer resources with which to pursue legal action against Shein and its suppliers.[7]

37.    Although its details and precise methods are secrets, it's possible to infer certain facts about SHEIN's algorithm by looking at its results. For example,

---

[7] Citing *Good on You*, "Shein," March, 2023. https://directory.goodonyou.eco/brand/shein. Dan Strumpf, "China's Fast-Fashion Giant Shein Faces Dozens of Lawsuits Alleging Design Theft," Wall Street Journal, July 3, 2022; https://www.wsj.com/articles/chinas-fast-fashion-giant-shein-faces-dozens-of-lawsuits-alleging-design-theft-11656840601; The Fashion Law, "Shein Owner Zoetop Claims Dr. Martens Trademarks Are Generic," October 26, 2021; https://www.thefashionlaw.com/in-response-to-airwair-lawsuit-shein-owner-zoetop-claims-dr-martens-trademarks-are-generic/; Dan Strumpf, "China's Fast-Fashion Giant Shein Faces Dozens of Lawsuits Alleging Design Theft," Wall Street Journal, July 3, 2022; https://www.wsj.com/articles/chinas-fast-fashion-giant-shein-faces-dozens-of-lawsuits-alleging-design-theft-11656840601.

1102992.1

it's impossible not to notice that SHEIN's process often generates products that are *exact or close copies* of the work of other designers: occasionally large ones, but more often than not independent leading designers such as Plaintiffs. These designers are just the sort who might be producing the most cutting-edge designs— and being able to identify them is the gold standard of a multi-million dollar trend forecasting company. They are also the designers least likely or to be able to fight back, including through legal action. It's also worth noting that the algorithm is Defendants' purposeful creation. We often hear about artificial intelligence being an existential threat to humanity because it might easily design itself into being our unstoppable evil overlords. Fortunately, that's not going on here. No one is suggesting that the algorithm developed itself to misappropriate the intellectual property of small designers. Rather, Plaintiffs' allegation is that the algorithm was purposefully designed by Defendants to function as it does.

38.     Without investigation, it is impossible to describe the particulars of how the SHEIN algorithm produces its results—how a design for a blanket or overalls finds its way from a designer's modest website to being cut and sewn in a sweatshop in Guangzhou, to then be offered for sale online (with millions of eager eyes waiting) for a price far below the original designer's *costs*.

39.     The carbon copy infringements that are the subject of this lawsuit perfectly illustrate this illicit process. And many similar examples can be found in the many other lawsuits against SHEIN clogging the federal courts; as well as designers legitimately venting their grievances on social media. Further—because SHEIN likely works hard to quickly settle cases before they are public—Plaintiffs allege on information and belief that there are many more instances of such copying that are so far not publicly known. In all of these cases, it would have been easy enough for SHEIN to appropriate 95% of the aesthetic appeal of any of these works by working assiduously (as other knockoff artists do) to change the designs "just enough" to avoid copyright liability. Yet still, SHEIN's process systematically

yields an exact or remarkably close copy, time and again. These brazen copies constitute counterfeiting and piracy, under relevant copyright and trademark statutes and related case law. They are certainly egregious—in that SHEIN is alleged to being engaged in a systematic effort to misappropriate intellectual property as described here, from many designers (including small independent designers who are particularly vulnerable) on a literally daily basis. In other words, it is purposefully and willfully harming these designers financially every day—and its sole purpose is to make even more of the incredibly revenue and profits that have turned it into such a financial success story.

40.     The only viable explanation for the brazenness of SHEIN's knockoffs is SHEIN's policy to knowingly accept, tolerate and even encourage and facilitate such misappropriation for profit—as has been at least obliquely reported in some of the media accounts, like this documentary or this summary. As mentioned, SHEIN's design process targets smaller-scale designers in a way that at very least simply disregards whether it generates an infringing copy, even an exact one, when it borrows from their work. Given the scale of SHEIN's design and production machine (generating 6000 new styles per day), the only way the algorithm could work (and as has been widely reported), is if very little information is communicated to the SHEIN "designers" —to the extent that humans are even involved—and factories other than the bare information about what the output should be. In other words, little or nothing is transmitted to Chinese factories beyond the original design itself.[8] This approach, together with other aspects of the algorithm, guarantees that the infringements will occur.

---

[8] On information and belief, and as a matter of business necessity, SHEIN's software contains little more than simple design specifications that help the person producing the goods execute new orders quickly. While a big brand might need a very high-end designer, or a designer with top technology and assistants, and even then, may only be able to produce a handful of styles in a month, SHEIN's "design" work (to the extent that the human component of such work could be called "design") could be executed even by someone untrained and unskilled. Were it otherwise, the cost calculus of the business model would not work.

41.     Top mainstream apparel makers rely on the talent and creativity of their designers—who might very well openly take inspiration from independent designers, whose work might be shown at a corporate design meeting or affixed to an "inspiration board" (physical or digital). SHEIN employs the sweatshop and creativity-free version of such a design process. In such iteration, there is no time for human creativity when small factories in China need to pump out six thousand new styles every day, on top of producing existing styles. Even if the algorithm "tries" to alter designs when it can, it (at very least) often generates an exact copy as a matter of business necessity, as an artifact of the algorithm.

42.     SHEIN's intellectual property compliance is handled in a similar way. Most fashion companies, use a common-sense method of avoiding intellectual property liability: they instruct their designers not to copy; they conduct computerized searches to verify that such instruction is heeded; and they have lawyers on hand to run "clearance" searches, review new products, and ask and answer any tough questions about how close is too close for a knockoff, or about fair use, substantial similarity, or likelihood of confusion.

43.     SHEIN's method is different: On information and belief, when the algorithm spits out a design, which is likely to be an infringement, it produces very small quantities of the item for sale. For each new product sold on SHEIN's website, the initial production run is as low as 100-200 units per SKU, compared to the thousands of pieces typically produced by traditional peer retailers. SHEIN then offers the goods for sale via its online channels, where millions of young people are waiting to look and purchase—and waits to see if anybody complains that the design was stolen. If the algorithm generates an exact copy of a Nike product, alarm bells will ring at that company's brand protection vendor. SHEIN will hear about the matter quickly and will "cease and desist" as instructed. From there, the case then settles after negotiation and perhaps litigation regarding damages. A strong corporate plaintiff like Nike will likely command a significant settlement—

leveraging SHEIN's exposure to enhanced damages for counterfeiting; indirect profits for the benefits derived from simply having the garment for sale; and perhaps statutory damages for willful infringement. But even if the settlement is considerable and far exceeds realized profits on a particular garment, it baked in as a tolerated cost of doing business.

44.     When SHEIN copies a small or independent designer, the most likely outcome (without brand protection specialists and specialized software on the lookout) is that the infringement will go unnoticed. Under those circumstances, SHEIN reaps all the benefits of stealing and featuring the design that its technology had identified as valuable enough to take: it makes sales and keeps it customers' eyes glued to the SHEIN site and app for that much longer. And if customer demand justifies it, the item is reordered, and more are sold (now that the coast has been determined to be clear).

45.     Sometimes, even a small-scale independent designer is alerted to the infringement—perhaps because a customer or friend happens to see it—and complains to SHEIN. In these cases, SHEIN quickly apologizes, blames an unnamed third party for the misconduct, and reports (often but not always accurately) that sales were shockingly low. Given that sales were negligible, and because the transgression was not SHEIN's fault after all, SHEIN might offer a very small settlement. Further, it might make such offer in a way that makes further negotiation seem doomed to fail. In Perry's case discussed below, SHEIN made its offer as if it were a mom-and-pop operation rather than one of the richest enterprises in the world. Under the circumstances, accepting $500 can seem like a win.

46.     If the designer is lucky enough to be steered to an attorney who will take his or her case (often a family or friend referral, or business lawyer who handles corporate or licensing matters for the designer), SHEIN, again, will report, correctly or incorrectly, that (1) the lawyer has had the bad luck of happening upon a case with almost no sales or profits, to the point where a fair profits-based

settlement is hardly worth pursuing; and (2) that the actual misconduct was committed by another company, which will be duly punished. SHEIN will also offer an apology and a vague explanation that makes it seem that this was an anomaly: somehow SHEIN got its wires crossed and produced a very small number of exact copies of the designer's goods. If it feels it has an advantage with respect to an overmatched plaintiff's counsel, SHEIN might assert that international sales/profits cannot be recovered under any circumstances. As with unrepresented parties, nine times out of ten the designer's counsel will accept what's offered, or bargain for just a little bit more.

47.     This testing-the-waters approach is an efficient and effective manner for SHEIN to avoid or minimize liability for infringement—while at the same time reaping the benefits of direct profits through sales, as well as the indirect benefits of featuring products identified as highly desirable and in vogue. Unfortunately, this business model is quite damaging to the independent designers whose work is misappropriated, like Plaintiffs here—who suffer the harm whether they mount a fight or not. For an up-and-coming talented designer—of exactly the sort that SHEIN's algorithm might target as worthy of copying— SHEIN misappropriating a key piece and offering it for sale at its typical rock-bottom price (achievable based on questionable labor practices), can be devastating. It might, for example, largely destroy the value of the item most responsible for driving a collection and interest from sales representatives and store buyers (not to mention consumers). For all the Plaintiffs in this action, SHEIN's offering exact copies of their goods for sale has led to financial damages.

48.     SHEIN makes no secret of its approach of offering very small numbers of very many products—although it doesn't highlight it as a way of avoiding intellectual property liability. Indeed, rather than trying to hide an approach that is easily observed, SHEIN touts the methodology as an integral part of its revolutionary pro-sustainability production process. The idea is fairly simple by

high-tech standards: SHEIN maintains that the point is to offer a few of each product to test consumer demand. SHEIN calls the idea of testing the waters with respect to a given product "the large-scale automated test and reorder (LATR) model," which it describes as if it were advanced systems science designed to reduce waste and environmental impact:

> For each new product sold on SHEIN's website, the initial production run is as low as 100-200 units per SKU, compared to the thousands of pieces typically produced by traditional peer retailers.

> We then use algorithms to gauge customer interest in real-time and provide feedback to our supplier partners, empowering them to increase or stop production based directly on market demand. We embrace a data-driven test and learn approach to improve efficiency and minimize production waste.

> As an e-commerce-only retailer, SHEIN avoids the need for overproduction typically associated with filling physical storefronts and prevents much of the waste and environmental impacts associated with running a traditional retail store. Through our unique on-demand business model we are able to consistently limit excess inventory to single digits, a percentage that is quite different than traditional retailers and one that results in substantially less waste.

49.     On information and belief, what SHEIN does not tell consumers is that LATR is in fact an integral part of a method of facilitating intellectual property theft, as described above. Part of SHEIN's business model is copyright and trademark infringement. It has settled an untold number of cases—and the funds required to do so are tolerated as an easily absorbed cost of doing business. When generating sales of $24 billion in a year— SHEIN could easily tolerate hundreds of millions in settlements before it would consider jettisoning the model that necessarily produces the infringements along with the profits. In other words, if left unchecked, SHEIN will continue to greatly damage the careers of the independent U.S. designers whose ideas it misappropriates (and continue to ignore related Congressional inquiries).

50.     This is not to say that SHEIN pays settlements to all comers, in whatever amount they demand. Rather, a further integral part of the business model

21                                    THIRD AMENDED COMPLAINT

and enterprise is the legal machinery put in place to minimize the cost of those settlements. This takes many forms, from disguising its size and sophistication as mentioned above, to jurisdictional skirmishes or other threshold battles that demonstrate to would-be plaintiffs that it might just be easier to settle than fight—especially because such scenarios are usually coupled with (1) claims of surprisingly low profits on the particular item in question, and (2) an offer of judgment, which actually put the designer in financial jeopardy if he or she refuses to settle. What SHEIN rarely does is fight on the ground that they have not infringed.

**D.     SHEIN is a decentralized constellation of entities, designed to improperly avoid liability.**

51.     This complaint refers to the wrongdoer as "SHEIN," because SHEIN refers to itself as a single business unit. Given its consistent marketing of SHEIN, the entire world refers to and thinks of SHEIN. Unlike SHEIN, the actual corporate entities behind SHEIN, e.g., Zoetop and Roadget, are not household names.  And indeed, there's no obvious reason for SHEIN to adopt a structure other than the traditional parent-and-subsidiary model used by virtually every other similar international retailer, including SHEIN's fast fashion rivals.

52.     SHEIN seems to go out of its way to portray itself in this unitary manner. Their site sheingroup.com bolsters this idea, especially after having been outed as a sprawling conglomerate in other lawsuits and in the media. SHEIN refers to "SHEIN's mission" and "our story"—and one can even click on a link for "corporate governance" (which leads to a page having nothing to do with corporate governance). The site speaks of SHEIN's "vision," and refers to its "offices" and the "SHEIN workplace." It refers to "our employees," and claims to have 10,000 of them, serving 150 countries. Customers are referred to various links at the domain shein.com (legal@shein.com). Across its web sites, apps, policies, contractual terms and press releases, SHEIN refers to all entities within its entire corporate structure as "SHEIN," including the following recent or current examples:

- "SHEIN is made up of unique individuals who believe that fashion brings dignity to world and hold true to the mission of making the beauty of fashion accessible to all."
- "From the United States to Singapore, SHEIN serves 150 countries in over 20 languages, dedicating ourselves to delivering the best customer experiences, built by our family of SHEIN . . ."
- "From our global offices, we reach customers in more than 150 countries."
- "Since SHEIN was founded in 2012, we have worked tirelessly toward our primary mission: making the beauty of fashion accessible to all."
- "SHEIN was founded in 2012 and has since grown to a team of nearly 10,000 employees selling to more than 150 countries."

53.     To further obfuscate its corporate structure, SHEIN sometimes (when trying to avoid liability) refers to its manufacturers and designers as outside and independent of the brand as a whole; it more commonly speaks of the "company" as doing its own design and logistics, including the following recent and current examples:

- To meet demand, we have built a fully digital supply chain that seamlessly and quickly delivers products to our customers worldwide. We use proprietary software to track sales and communicate with our factories in real time to order in small batches. Our digital supply chain is the core of our business model and empowers us to offer a wide range of on-trend styles without creating excessive inventory waste or making customers wait weeks for their orders to be fulfilled.
- Since SHEIN was founded in 2012, we have worked tirelessly toward our primary mission: making the beauty of fashion accessible to all. Throughout the past decade, we developed tools to help us fulfill that goal — by implementing automation to optimize production efficiency and our supply

THIRD AMENDED COMPLAINT

chain, we were able to provide customers with an affordable range of hyper-trendy styles.

- We believe that our workforce should mirror the diversity and creativity of our customers, which is why we set up local operations in key markets to build authentic connections with our global consumer base.

- We are working to assess the impact of SHEIN's business — socially and environmentally — at all levels of our value chain. As we take ownership of SHEIN's impact in the world, we can seize opportunities to use the company as a driver for social good, leveraging the SHEIN Cares Fund to support organizations tackling critical issues, financially supporting fashion entrepreneurs and investing in emerging technologies to reduce our environmental impact and make circularity a reality.

- SHEIN is a digital first fashion and lifestyle e-tailer with key operation centers in Singapore, China, the U.S. and other major global markets.

54.    Despite these claims and self-portrayals, extensive research reveals that there really is no one central entity called SHEIN. There is no one company employing 10,000 people. Rather, the subsidiaries, affiliates, independent contractors, and agents of "SHEIN" are loose-knit, distinct from each other and the SHEIN "indirect operating parent," and ever-changing. As explained below, this structure minimizes, and was intended to minimize, exposure to liability and blame, including liability for intellectual property infringement.

55.    An influential BBC Channel 4 documentary exposing some of SHEIN's practices (called "Inside the Shein Machine", available here) explains: "**When you start to look behind that, at who is the company, it's a big black hole**." This assertion is backed up by extensive research. A recent and now-settled counterfeiting lawsuit against SHEIN brought by a prominent streetwear brand, supported by impressive and thorough research, came to a similar conclusion—and tied the corporate shell game that is SHEIN to the specific goal of wrongfully

1  avoiding or minimizing liability for its wrongdoing, including copyright

2  infringement:

> Despite diligent research, it appears there is no registered entity named "Shein"; however, on information and belief, Defendants have operated together under the name "Shein" and have been able to get away with trademark and copyright infringement for years by using empty corporate shells to serve as litigation targets. In addition to shamelessly stealing the intellectual property of others and prolifically creating cheap knockoffs at great profit for themselves, Defendants have purposely set up a situation where they obfuscate jurisdiction and hide behind multiple shell companies from various jurisdictions, in effect creating a corporate shell game.

9  56.    As one news article has reported, "The corporate structure of Chinese

10  fast-fashion giant SHEIN is opaque and tax-optimized, and ownership is unclear. A

11  multitude of brands make the group even less tangible." Opaque and tax-optimized:

12  SHEIN's Corporate Structure, Public Eye, 2022, (www.PublicEye.ch). To illustrate,

13  the article offers the following schematic diagram of SHEIN:



26  57.    The chart accurately portrays the difficulty in pinning down exactly

27  what SHEIN is. But in fact, the truth is far more complicated, as Plaintiffs' own

research had revealed, confirming that SHEIN is a loose and overtly decentralized amalgamation of entities, as described below.

58.     One way in which SHEIN uses its byzantine structure to advantage is by making it impossible for intellectual property plaintiffs to figure out who to sue. Unrepresented parties face an utter brick wall. But even plaintiffs with attorneys, with strong cases, struggle to find an appropriate defendant. In the end, they simply sue whatever party they can find, and hope to straighten the matter out in discovery. Generally, this uncertainty imposes a hurdle to plaintiffs, by design exploited by SHEIN, who end up settling for less because they are not sure they have the correct party—and face daunting discovery against an entrenched defendant to try to find out.

59.     Indeed, if one searches federal dockets on Westlaw or Lexis for "SHEIN," one finds quite a few intellectual property infringement actions filed in the last few months—and there is certainly no clear consensus about whom to sue. SDC is currently popular probably because it simply sounds like a proper defendant as a "distributor." Further, plaintiffs suing SDC face obstacles: On information and belief, SHEIN regularly tells plaintiffs suing SDC that foreign profits are absolutely off the table and will not be disclosed, and that SDC does not control whatever company is designing the clothing at issue.

60.     Many SHEIN lawsuits are filed against Zoetop, but it appears that most plaintiffs choosing Zoetop are simply copying others in naming this entity, because it is difficult to find any tangible evidence of what this entity does. While suing Zoetop solves some of the problems identified, and perhaps attacks higher on the governing ladder, Zoetop can and has challenged personal jurisdiction, imposing another huge burden on plaintiffs facing expensive pleading challenges. For example, in a major action by a well-funded plaintiff with elite trial counsel, the parties fought endlessly over such a jurisdictional skirmish, which is arguably what led SHEIN/Zoetop to finally settle.

1102992.1

61.     Some of the most sophisticated recent SHEIN lawsuits now name what appears to be the highest level worldwide administrative unit, i.e., Roadget. When SHEIN filed its own IP litigation recently, against new rival and alleged copycat "Temu"— it did so under Roadget. Roadget would be a good choice as an infringement defendant because it can hardly claim lack of jurisdiction after it has sued here—but disclosing the Roadget entity was just another move designed to obscure who might be liable for SHEIN misconduct. When Roadget sued, it alleged that it is suing as the "the owner of the famous SHEIN trademarks in the United States (and worldwide)," and as the "owner of the website located at https://us.shein.com and the corresponding mobile application", but never identifying itself as a traditional "parent company" or as a seller or distributor of SHEIN branded clothing.

62.     In addition, SHEIN references mysterious other companies as being responsible for any actual infringements. A common initial defense offered by SHEIN, in response to a simple letter directly from an obviously aggrieved artist, is to claim that whatever entity was contacted is not the one who committed the infringement.

63.     On information and belief, the Defendants recognize the liability exposure for their obvious counterfeiting and willful and criminal infringing activities and, therefore, have gone to great lengths to disguise themselves and their corporate relationships so as to avoid liability for wrongdoing. On information and belief, Defendants create entities designed to allow the wrongdoers to avoid liability and challenge U.S. jurisdiction over them.

**E.     Defendants use their decentralized organization to avoid liability.**

64.     One case, pending before Judge Gutierrez until settled in 2020 is another example (among many) of individual participants in SHEIN using its formally decentralized nature to make it more difficult and expensive for a plaintiff, with a clearly meritorious case, to recover. In that case, the plaintiff alleged a simple

27                           THIRD AMENDED COMPLAINT

and obvious infringement by SHEIN, against SFG and Zoetop.[9] Defendants largely avoided liability. Zoetop, which could not be served except under Hague, was found to be a necessary party. And the only proper party before the court, according to SHEIN, was SFG, which SHEIN pointed out "does not own, operate, or control the website www.shein.com, it books no revenues from the website, and it did not make, sell, offer for sale, process returns of, or otherwise distribute the allegedly infringing t-shirt." In other words, there was no one to recover from due to SHEIN's multiplicity of entities—even though the infringement was clear and even though SHEIN takes in virtually unlimited money from American consumers. On information and belief, these are regular and recurrent practices employed by SHEIN's lawyers to defend individual components of the SHEIN, as required in a given case.

65.   2020 was long ago in the history of SHEIN and the individual entities mentioned above. In fact, some of the most prominent entities that are now part of SHEIN (such as SDC and Roadget) did not yet exist in 2020. Further, Judge Gutierrez was obviously not made aware of many of the facts alleged and explained here. In fact, rather than disclose important facts, SHEIN made an ambitious attempt to seize the moral high ground, which in this case worked:

> Plaintiff, apparently a self-appointed crusader against Chinese fast fashion companies, wants to avoid having to serve Zoetop pursuant to The Hague Convention, of which Hong Kong is a member. It wants to hold Defendant [SFG], a California entity, liable for the t-shirt that was sold off of Zoetop's website.

66.   This single sentence of argument is a prime example of SHEIN using its multiplicity of distinct entities to avoid liability. If that case had gone on (i.e., if an exhausted plaintiff had not settled), SHEIN would have argued that SFG had nothing to do with the design on the t-shirt in question—which might technically have been true given the corporate structure. SHEIN went on to explain its 2020

---

[9] *Cat Coven, LLC v. Shein Fashion Group, Inc.*, 2:19-CV-07967.

version of how things worked *in a way that as a practical matter would leave no entity obviously liable*.

> SFG performs marketing services for Zoetop in the United States and undoubtedly has a relationship with Zoetop. But it does not own, operate, or control the website www.shein.com, it books no revenues from the website, and it did not make, sell, offer for sale, process returns of, or otherwise distribute the allegedly infringing t-shirt. Regardless, SFG is not asking for a finding of no liability in its Motion to Dismiss; instead, SFG's Motion only seeks to join Zoetop so that SFG's rights (and Zoetop's) will not be impaired.

The matter settled not long after Judge Gutierrez dismissed the case against Zoetop.

67. Perry's experience is another case in point. Perhaps SHEIN really does delegate simple copyright disputes to local Chinese representatives—but whether they do or not, the net result is that most artists would simply take the $500 (as Perry did) rather than attempt to communicate with an agent. In other words, the far-flung nature of the SHEIN business, and its lack of visibility and transparency, leads to lower settlement numbers on a systematic basis. The fact there is not one entity to hold accountable makes it all the easier to frustrate those with legitimate claims.

68. As mentioned, SHEIN regularly argues that whatever entity is being sued does not have access to information held by the company responsible for design. On information and belief, liability avoidance is a primary purpose of employing such structure—and SHEIN multiplies the effect by changing the entities on a regular basis (while maintaining overall continuity by simply making replacements, such as Roadget for Zoetop) making pursuit of a legitimate remedy all the more difficult. Further, even where SHEIN's law firms cannot credibly argue that no defendant is liable, it can throw up legal roadblocks, meritorious or not, to make recovery all the more difficult and all the more expensive—inevitably leading to a lesser, fraudulently induced settlement than if SHEIN employed a traditional unified corporate structure.

69. Besides improperly refusing to disclose information, research on prior cases also reveals that, on information and belief, SHEIN is not above out-and-out

deception—which is rendered easier by its decentralized nature. Recently, Levi's alleged that SHEIN, after agreeing to cease selling a certain design, and changing the items shown for sale on the SHEIN website in a mutually agreeable manner, a test purchase revealed that SHEIN was in fact still selling the original infringing product. Further, on information and belief, in case after case, SHEIN will represent that all arguably infringing products have been identified—only to have additional infringing items discovered later if the plaintiff somehow has the resources to track them down. On information and belief, this sort of deception is simply easier when it can be blamed on a smaller business unit.

70.     SHEIN's multiplicity of entities and decentralization also aids in efforts to use its LATR approach, explained above, to avoid liability for intellectual property infringement. Again, waiting to see if anyone complains or sues, as a method of intellectual property compliance, works better when fingers can be pointed elsewhere. For example, when LATR yields a copyright or trademark cease and desist letter or lawsuit, SHEIN's first line of defense generally couples removing the product from its sites with blaming the misconduct on another actor (implying such actor is independent). While unrepresented parties and most unsophisticated attorneys assume this other company is fully independent of the entity being sued, it doesn't much matter that experienced attorneys understand that the culprit is a company under the same general umbrella. The methodology is equally effective.

### THE REALITY OF SHEIN'S CORPORATE STRUCTURE

71.     SHEIN does not exist as a single corporate entity. When Defendants use the term "SHEIN," they refer to a loosely knit conglomeration of companies spread throughout the world. Given that the SHEIN website (www.sheingroup.com) refers to Xu as a founder and CEO of SHEIN, Xu is presumably the individual who ultimately controls, operates, and manages all persons and entities that make up the SHEIN conglomerate.

1    **Roadget Business Pte., Ltd**.

2    72.    Within this conglomerate, Roadget appears to be the closest thing to a

3    corporate parent. In several Rule 7.1 corporate disclosure statements filed with

4    federal courts throughout the United States, Roadget acknowledges that it is a

5    "private Singapore Limited Company with no operating parent." In these corporate

6    disclosure statements, Roadget is also identified as the "indirect operating parent" of

7    SDC and Shein Tech.

8    73.    Roadget has also acknowledged in publicly filed documents that it is

9    the owner of us.shein.com and the corresponding mobile app, which it has licensed

10   to SDC since August 1, 2021. Roadget previously licensed the website to Zoetop.

11   74.    A search of trademark applications filed with the U.S. Patent and

12   Trademark Office ("USPTO") also reveals that Roadget is the owner of dozens of

13   trademarks that are in use throughout the United States and the world.

14   **Zoetop Business Co., Ltd.**

15   75.    Zoetop appears to be the entity ultimately responsible for SHEIN's

16   global operations, with the exception of the United States. In several Rule 7.1

17   corporate disclosure statements filed with federal courts throughout the United

18   States, Zoetop is identified as a private Hong Kong company with "no operating

19   parent."

20   76.    Before August 1, 2021, Zoetop states that it "sold … products in

21   categories ranging from apparel (women's, men's, and children's), footwear, home

22   goods, and accessories" in the United States. Zoetop now claims that it "is no longer

23   operational and does not sell any products." Upon information and belief, at a

24   minimum, Zoetop continues to operate in non-U.S. markets. Zoetop further

25   continues to be named as a defendant in copyright infringement actions filed in the

26   U.S. Courts and continues to be represented by counsel in those actions, including in

27   this action.

28

77.     On August 21, 2019, Zoetop filed an action captioned *Zoetop Business Co. Ltd. v. Shuffle Presents LLC, et al.*, Case No. 1:19-cv-05641 (N.D. Ill.). The action arose out of Zoetop's agreement to participate in a multi-brand, interactive marketing campaign on college campuses in the United States. Zoetop alleged claims for fraud, breach of contract, conversion, and trademark infringement against the defendant. The complaint was brought by Zoetop, d/b/a Shein, and throughout the complaint Zoetop refers to itself as "Shein." The action was dismissed pursuant to a joint stipulation of dismissal on March 16, 2021.

78.     Moreover, although Zoetop has transferred many of SHEIN's U.S. trademarks to Roadget, USPTO records indicate that Zoetop continues to own several U.S. trademarks, including those trademarks identified by serial numbers: 87092539, 87093871, 87093864, 87002014, 88809710, 86858103, 90392762, 87857188, 87857183, 90368040, 90368038, and 85706054.

79.     In October 2022, Zoetop agreed to pay the New York Attorney General $1.9 million in penalties and costs because it failed to properly handle a data breach that compromised the personal information of 39 million SHEIN consumers worldwide and because it lied to consumers about the scope of the breach. For the vast majority of SHEIN accounts impacted by the breach, Zoetop failed to alert customers that their login credentials had been stolen.

**Shein Distribution Corporation (SDC)**

80.     SDC is the entity currently responsible for SHEIN's U.S. operations. SDC is a Delaware corporation formed in 2021. In public filings, SDC represents that its principal office address is 757 S. Alameda Street, Suite 220, Los Angeles, California. SDC has represented in Rule 7.1 corporate disclosure statements that its "indirect operating parent" is Roadget.

81.     Since August 1, 2021, SDC has further acknowledged that it is responsible for selling SHEIN products to U.S. consumers through the website https://us.shein.com and the corresponding mobile app, which it operates pursuant to

1102992.1

a license from Roadget. SDC sells products in categories ranging from apparel (women's, men's, and children's), footwear, home goods, and accessories.

82.     SDC is registered as a foreign corporation in both California and Indiana.

83.     Several public filings state that Chiao is the President of SDC.

**Shein Fashion Group, Inc. ("SFG")**

84.     SFG was a California corporation established in December 2015.

85.     Import records indicate that until December 2019, SFG was receiving shipments from Guangzhou Shein International Import & Expot Co., Ltd. and from Zoetop. The publicly available records indicate that SFG mostly imported packaging materials, such as boxes, transparent plastic bags, label paper, and glass cases.

86.     On March 2, 2020, Chiao filed a declaration in support of SFG's motion to dismiss the *Cat Coven* lawsuit. Chiao did not identify himself as an officer of SFG but stated that, based on his personal knowledge, SFG performs marketing services for Zoetop, such as "creating website graphics, design elements, and English language translations for the website [www.shein.com](www.shein.com) and [sic] corresponding mobile application."

87.     On November 5, 2019, SFG filed an amendment with the California Secretary of State, changing its name to Fashion Marketing and Merchandising Group, Inc.

**Fashion Marketing and Merchandising Group, Inc. ("FMMGI")**

88.     On August 23, 2021, and December 9, 2021, FMMGI filed Corporation Statements of Information with the California Secretary of State. The statements identified Mingshi Hu as FMMGI's President/CEO. Chiao was not listed as an officer of FMMGI or otherwise mentioned in the statements. The statements listed FMMGI's principal place of business as 345 N. Baldwin Park Blvd., City of Industry, California.

89.     On August 31, 2022, FMMGI filed a Certificate of Dissolution with the California Secretary of State.

**Style Link Logistics LLC ("Style Link")**

90.     On April 9, 2021, Style Link filed Articles of Organization with the Indiana Secretary of State. The articles identified Chiao as Style Link's "Manager" and stated that Style Link's principal office was located at 345 N. Baldwin Park Blvd., City of Industry, California.

91.     On August 8, 2021, Chiao filed a notice of change of principal address with the Indiana Secretary of State, stating that Style Link's principal office was now located at 5402 E. 500 S., Whitestown, Indiana.

92.     Import records indicate that Style Link has already received several shipments from Roadget in 2024. The publicly available records indicate that Style Link mostly imports packaging materials, such as cartons, packing bags, label paper, and plastic crates.

**Shein Technology LLC ("Shein Tech")**

93.     On July 7, 2021, Shein Tech filed Articles of Incorporation with the Delaware Secretary of State.

94.     On July 30, 2021, Shein Tech registered as a foreign corporation with the California Secretary of State.

95.     On April 14, 2022, Shein Tech registered as a foreign corporation with the Indiana Secretary of State. Shein Tech stated that its principal office was located at 777 S. Alameda St., Los Angeles, California. Shein Tech identified Chiao as its President, whose office was located at 757 S. Alameda St., Los Angeles, California.

96.     In documents filed with federal courts, Mark Aitken, II ("Aitken") has been identified as the Vice President of U.S. Public Affairs for Shein Tech. Aitken resides in the Washington. D.C. metropolitan area.

97.     In his linkedin.com bio, however, Aitken identifies himself as "Vice President, U.S. Public Affairs at SHEIN." Aitken further represents that he

"oversees SHEIN's U.S. government relations team and collaborates with various internal functions, federal government relations firms, and industry stakeholders to help address SHEIN's strategic priorities in the United States."

98.    Although not an employee of SDC, Aitken verified two sets of SDC interrogatory responses that were dated April 20, 2023, and August 3, 2023 in the action captioned: *Stark v. Shein Distribution Corp.*, Case No. 2:22-cv-06016 (C.D. Cal.). Aitken also verified SDC's interrogatory responses in the *Bishop* and *Alison Lou* lawsuits.

**Guangzhou Shein International Import & Export Co Ltd**. **("Guangzhou")**

99.    Guangzhou is a Chinese based company involved in the production and design of SHEIN goods and in the export of those goods from China to the U.S.

100.    On information and belief, Guangzhou contracts with and coordinates with smaller Chinese production companies. Guangzhou, along with these smaller Chinese production companies, manufactures the infringing products and export those products to the U.S. for sale by SDC and by Zoetop (at least until August 1, 2021).

**Tim Wei**

101.    According to SHEIN's court filings, Wei is former in-house counsel for Zoetop and current in-house counsel for Roadget. In a sworn declaration, Wei further states that "[a]t Zoetop, [he] was responsible for managing legal matters surrounding Zoetop's sale and marketing of products, including product procurement agreements with third-party suppliers, product clearance, alleged intellectual property infringement and related complaints." He also represents that he is "familiar with the reorganization that saw SDC replace Zoetop as the seller of goods to U.S. consumers via the U.S. Website."

102.    In his sworn statements, Wei also professes knowledge of SDC's "product listings, intellectual property complaints and associated actions."

**The Shein Law Firms**

103.     An integral part of the SHEIN business model is the minimization of liability for the intellectual property infringements it plans to commit (as systematic results of SHEIN's design process). Part of this liability-avoidance is accomplished by the Defendants' obfuscation of its corporate structure.

104.     SHEIN's liability-avoidance is also highly dependent upon a small roster of law firms employed by Defendants to impose obstacles on plaintiffs—the particulars of which depend on the facts of the case, the legal acumen of plaintiff or plaintiff's counsel, which entity has been sued, and any other relevant considerations—after which a settlement is always reached.

105.     The obstacles rarely involve fighting the case on the merits, but might rather include extensive discovery battles; (on information and belief) representing that sales of the offending item(s) are extremely low, whether or not that is true; offering apologies and false explanations about independent companies who are the true culprits; preliminary pleading or jurisdictional challenges—all designed to cause fighting the case to be that much more expensive and long before the merits are reached.

106.     On information and belief, the Shein Law Firms have honed and repeatedly pursue, unmeritorious legal positions and approaches to wrongfully withholding information, and imposing wrongful obstacles to hearing of intellectual property cases on their merits. The Shein Law Firms include, but may not be limited to, Greenberg Traurig LLP and Pietz & Shahriari, LLP.

107.     Through the Shein Law Firms, Defendants ultimately intend to fraudulently induce the victims of its copyright infringement to enter into settlement agreements for far less consideration than the victims are entitled to receive. Plaintiffs do not, at this point, allege that the Shein Law Firms knowingly and intentionally participate in Defendants' unlawful conduct.

## **ACTS OF RACKETEERING**

108. Defendants, by and through their respective enterprise(s) have engaged in the following acts of racketeering, as defined by 18 U.S.C. § 1961(1):

### **Criminal Copyright Infringement**

### **(18 U.S.C. § 2319)**

109. The acts of copyright infringement set forth in COUNTS I-XI, infra, were willful and committed for the purposes of commercial advantage or private gain in violation of 17 U.S.C. § 506(a)(1)(A) and are punishable pursuant to 18 U.S.C. § 2319(b).

110. In addition to Plaintiffs, many other artists and creators have brought copyright infringement claims against SDC, SFG, Shein Tech, Zoetop, and Roadget. Plaintiffs allege that the acts of copyright infringement set forth in the complaints filed against Defendants in the following lawsuits were willful and committed for the purposes of commercial advantage or private gain in violation of 17 U.S.C. § 506(a)(1)(A) and are punishable pursuant to 18 U.S.C. § 2319(b).

  a. *Tan v. Shein Distribution Corp., et al.*, Case No. 1:23-cv-08469, Complaint for Copyright Infringement at ¶¶ 14-33 (S.D.N.Y. September 26, 2023).

  b. *Hefferman v. Shein Distribution Corp.*, Case No. 23-CV-1271(JGK), Second Amended Complaint at ¶¶ 21-63 (S.D.N.Y. November 3, 2023).

  c. *Moebius v. Shein Distribution Corp., et al.*, Case No. 2:22-cv-8259, First Amended Complaint at ¶¶ 12-57 (C.D. Cal. September 11, 2023).

  d. *Bishop v. Shein Distribution Corp., et al.*, Case No. 23-CV-1277 (MKV), First Amended Complaint at ¶¶ 22-41 (S.D.N.Y. July 10, 2023).

  e. *Alison Lou LLC v. Shein Distribution Corp.*, *et al.*, Case No. 23-CV-1268, First Amended Complaint at ¶¶ 29-58 (S.D.N.Y. July 12, 2023).

f.  *Fichera v. Zoetop Business Co., Ltd., et al*., Case No. 1:23-cv-20417, Complaint for Copyright Infringement at ¶¶ 15-35 (S.D. Fla. February 1, 2023).

g.  *Stark v. Shein Distribution Corporation*; Case No. 2:22−cv−06016-WLH-RAO, Complaint at ¶¶ 9-29 (C.D. Cal. August 24, 2022).

h.  *Cat Coven LLC v. Shein Fashion Group, Inc., et al.*, Case No. 2:19-cv-07967-PSG-GJS, Amended Complaint and Demand for Jury Trial at ¶¶ 11-35, 63-71 (C.D. Cal. May 8, 2020).

**Mail and Wire Fraud**

**(18 U.S.C. §§ 1341, 1343)**

111.   Defendants, by and through their enterprises, engaged in a systematic and ongoing scheme with the intent to defraud, deceive, and/or mislead the public, consumers, Plaintiffs, and others whose designs it has infringed (collectively referred to herein as "victims"). Defendants knowingly devised and/or knowingly participated in a scheme or artifice to defraud the victims or to obtain the money or property of the victims by means of false or fraudulent pretenses or representation in violation of 18 U.S.C. §§ 1341, 1343.

112.   Defendants' copyright infringement, deceptive websites and marketing methods, and other business practices described above are contrary to public policy or fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society in violation of 18 U.S.C. §§ 1341, 1343.

113.   Defendants could foresee that the U.S. Mail and/or interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. §§ 1341, 1343.

114.   Defendants acting singly and in concert, personally and through its enterprises, used the U.S. Mail or interstate wires or caused the U.S. Mail or

interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud the victims, within the meaning of 18 U.S.C. §§ 1341, 1343.

115. By way of example, however, Defendants specifically used the interstate wires or caused the interstate wires to deliver:

a. Defendants' infringing "Make it Fun" design to every user who viewed Defendants' infringing design on its app and/or website after Perry's original design was first published on September 1, 2018;

b. Defendants' infringing "Floral Bloom" design to every user who viewed Defendants' infringing design on its app and/or website after Perry's original design was first published on October 21, 2020;

c. Defendants' infringing "Trying my Best" design to every user who viewed Shein's infringing design on its app and/or website after Baron's original design was first published on November 16, 2016;

d. Defendants' infringing "Orange Daisies" design to every user who viewed Defendants' infringing design on its app and/or website after Blitz's original design was first published on July 28, 2019;

e. Defendants' infringing "Running" design to every user who viewed Defendants' infringing design on its app and/or website after Marble's original design was first published on November 16, 2016;

f. Defendants' infringing "Cat Hair Pin" design to every user who viewed Defendants' infringing design on its app and/or website after Pfeffer's original design was first published on October 16, 2016;

g. Defendants' infringing "Big Honeycomb Hair Pin" design to every user who viewed Defendants' infringing design on its app and/or website after Pfeffer's original design was first published on December 16, 2016;

h. Defendants' infringing "Beach Bracelet Photos" to every user who viewed Defendants' infringing photos on its app and/or website after EJL's original photos were first published in April 2023;

i. Defendants' infringing "Avril Skull" artwork to every user who viewed Defendants' infringing artwork on its app and/or website after Smith's original artwork was first published in November 2004;

j. Defendants' infringing "Lee Works" artwork to every user who viewed Defendants' infringing artwork on its app and/or website after Lee's original artwork was first published in September 2020, April 2022, and April 2020;

k. All designs that Defendants misappropriated from the rightful owner of the copyright and that were viewed on Defendants' app and/or website between 2016 and the present; and

l. All posts and pages on Defendants' website (https://us.shein.com or https://shein.com) that obfuscate or misrepresent SHEIN's corporate structure for the purpose of making it impossible for victims to identify the entity or entities responsible for the theft of intellectual property.

116.   By way of example, Defendants also caused the U.S. Mail and interstate wires to deliver all of the following communications that furthered and facilitated their scheme to defraud:

| Type of Communication | Date | From | To | Description |
|---|---|---|---|---|
|  |  |  |  |  |
| U.S. Mail or E-filing | 12/21/2015 | SFG | CA Secretary of State | Articles of Incorporation enabling SFG to do business in California and elsewhere. |
| U.S. Mail or E-filing | 03/30/2018 | Zoetop | USPTO | Application to trademark SHEIN under Serial Number 87857183. Plaintiffs further incorporate all mails and wire transmissions made by Zoetop in support of this application. |

| U.S. Mail or E-filing | 09/06/2018 | Roadget | USPTO | Application to trademark SHEIN under Serial Number 88107571. Plaintiffs further incorporate all mails and wire transmissions made by Roadget in support of this application. |
|---|---|---|---|---|
| U.S. Mail or E-filing | 10/30/2019 | SFG | CA Secretary of State | Amendment to change name from SFG to Fashion Marketing and Merchandising Group, Inc. (FMMGI) facilitating SFG's effort to evade lawsuits and the claims for creditors. |
| U.S. Mail or E-filing | 09/17/2019 | Roadget | USPTO | Application to trademark SHE&IN under Serial Number 88620505. Plaintiffs further incorporate all mails and wire transmissions made by Roadget in support of this application. |
| U.S. Mail or E-filing | 01/28/2020 | Roadget | USPTO | Application to trademark SHEIN under Serial Number 88776666. Plaintiffs further incorporate all mails and wire transmissions made by Roadget in support of this application. |
| U.S. Mail or E-filing | 02/25/2020 | Zoetop | USPTO | Application to trademark SHEIN CURVE under Serial Number 88809710. Plaintiffs further incorporate all mails and wire transmissions made by Zoetop in support of this application. |
| U.S. Mail or E-filing | 03/25/2020 | Roadget | USPTO | Application to trademark SHEIN PREMIUM under Serial Number 88847681. Plaintiffs further incorporate all mails and wire transmissions made by Roadget in support of this application. |

THIRD AMENDED COMPLAINT

1102992.1

| Email | 06/16/2020 | Perry | shein.com | Perry notifies Shein that it is violating her copyright, demands removal of the work from Shein's website, and demands compensation. |
|---|---|---|---|---|
| Email | 06/18/2020 | shein.com | Perry | Shein informs Perry that it "took down" the infringing product and falsely stating, among other things, that it "was not produced by our company" but by "a local vendor in a large artpainting [sic] and accessory market in China." |
| Email | 06/19/2020 | Perry | shein.com | Perry demands compensation and destruction of the infringing products. |
| Email | 06/29/2020 | Perry | shein.com | Perry notifies SHEIN that she's not received a response to her June 19 email and again requests compensation. |
| Email | 06/30/2020 | Sharon He (shein.com) | Perry | He acknowledges SHEIN's "negligence" and falsely states, among other things, that SHEIN conducted a Google image search but "did not find any right holder's info" and falsely states that profit from the infringing sales was "very small." He offers to pay Perry $300. |
| Email | 07/01/2020 | Perry | shein.com | Perry disputes SHEIN's claim that it conducted an image search, stating that the image of her work "exists in many places on the internet" and "[w]ith little effort, [SHEIN] would easily find [it]self on my artist website." Perry also rejects the offer of $300 and demands that the infringing product listing be removed in full. |

THIRD AMENDED COMPLAINT

1102992.1

| Email | 07/13/2020 | shein.com | Perry | SHEIN falsely states that it did "not intentionally violate your copyrights." |
|---|---|---|---|---|
| Email | 07/14/2020 | shein.com | Perry | SHEIN asks Perry to send an invoice to Zoetop. |
| Email (attachment) | 07/15/2020 | Perry | Zoetop | Perry invoices Zoetop for $500 pursuant to the fraudulently induced agreement to "reimburse[ Perry] for stolen art work used without artist's knowledge or permission." |
| Paypal | 07/17/2020 | Sharon He (shein.com) | Perry | Zoetop pays Perry $500. |
| Email | 07/20/2020 | Perry | shein.com | Perry confirms receipt of payment. |
| U.S. Mail or E-filing | 02/24/2021 | Roadget | USPTO | Application to trademark DAZY under Serial Number 90545647. Plaintiffs further incorporate all mails and wire transmissions made by Roadget in support of this application. |
| U.S. Mail or E-Filing | 04/09/2021 | Chiao on behalf of Style Link | IN Secretary of State | Filing of Articles of Organization, enabling Style Link to do business in IN and elsewhere. The articles state that Style Link's principal office is located at 345 N. Baldwin Park Blvd., City of Industry, CA. |
| U.S. Mail or E-Filing | 04/30/2021 | SDC | DE Secretary of State | Articles of Incorporation enabling SDC to do business in DE and elsewhere. |
| E-Filing | 05/25/2021 | SDC | CA Secretary of State | Foreign registration statement enabling SDC to do business in California. |
| U.S. Mail or E-Filing | 07/07/2021 | Shein Tech | DE Secretary of State | Filing of certificate of incorporation, enabling Shein Tech to do business in DE and elsewhere. |
| U.S. Mail | 07/26/2021 | Chiao on behalf of SDC | CA Secretary of State | Statement of Information enabling SDC to remain in good standing with and do business in the State of |

| | | | | |
|---|---|---|---|---|
| | | | | California. |
| U.S. Mail or E-Filing | 07/30/2021 | Shein Tech | CA | Foreign registration statement enabling Shein Tech to do business in the California. |
| Email | 08/10/2021 | Iris (sheingroup.com) | Perry | SHEIN invites Perry to enter a license agreement to sell her products on SHEIN websites. |
| Email | 08/10/2021 | Perry | sheingroup.com | Perry declines SHEIN's invitation stating that she is disgusted by SHEIN'S theft of her artwork and that of other artists. Perry demands that SHEIN never contact her again. |
| E-filing | 08/20/2021 | Chiao on behalf of Style Link | IN Secretary of State | Notice that Style Link's address has changed from 345 N. Baldwin Park Blvd., City of Industry, CA to 5402 E. 500 S., Whitestown, IN. The notice enabled Style Link to stay in good standing with the state of Indiana. |
| E-Filing | 08/23/2021 | FMMGI | CA Secretary of State | Statement of information noting, among other things, that FMMGI's address is 345 N. Baldwin Park Blvd., City of Industry, CA and enabling FMMGI to stay in good standing with the state of California. |
| E-filing | 12/09/2021 | FMMGI | CA Secretary of State | Statement of information enabling FMMGI to stay in good standing with the state of California. |
| E-filing | 04/22/2022 | SDC | IN Secretary of State | Foreign registration statement enabling Shein Tech to do business in the Indiana and noting that Chiao is its president. |
| E-filing | 04/14/2022 | Chiao on behalf of Shein Tech | IN Secretary of State | Foreign registration statement enabling Shein Tech to do business in the Indiana. |
| U.S. Mail or E-Filing | 08/31/2022 | FMMGI | CA Secretary of State | Certificate of Dissolution facilitating SFG/FMMGI's |

| | | | | |
|---|---|---|---|---|
| | | | | effort to evade lawsuits and the claims of creditors. |
| Text message | 02/01/2023 | sheinofficial | Cassey Ho | SHEIN responds to Ho's internet posts claiming that SHEIN has stolen her designs and suggests a telephone call between Ho and Chiao. |
| Zoom Call | 02/22/2023 | Chiao | Cassey Ho | Chiao told Ho that SHEIN did not steal her designs, that SHEIN is just a marketplace, and has no idea whether third-party sellers have stolen designs. Chiao claimed that SHEIN was doing nothing illegal. He further claimed that SHEIN had sold only 28 products that infringed Ho's design. |
| E-filing | 06/27/2023 | Chiao on behalf of Style Link | IN Secretary of State | Business Entity Report enabling Style Link to stay in good standing with the state of Indiana. |
| Website and Email | 02/08/2024 | SHEIN | Media | Press release announcing that SHEIN will be opening a Settle-area office that will serve as a hub for SHEIN's U.S. fulfillment and logistics. Unless stopped, SHEIN will use this office to continue to distribute infringing products. |
| Internet Profile | Ongoing | M. Aitken, II | Linkedin.com | Aitken falsely states, among other things, that he works for SHEIN, not Shein Tech. |
| Internet Profile | Ongoing | George Chiao | Linkedin.com | Chiao's profile deceptively omits any reference to his roles at Style Link or Shein Tech, enabling SHEIN to foster the illusion that Style Link and Shein Tech are independent of SDC. |

117.   All of the wire communications described above crossed interstate and international borders by reason of the technology used to transmit the communication.

118.   It is not possible for Plaintiffs to plead with particularity all instances of wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications are within the exclusive control and within the exclusive knowledge of Defendants and other presently unknown individuals. For example, each infringing design or artwork that is described herein was more than likely viewed hundreds or thousands of times for the weeks, months, or years that the infringing product was being sold on SHEIN's App. The analytical data that would establish the who, what, when, where relating to each time an infringing design was viewed is proprietary information that is within SHEIN's exclusive control. That analytical data is not available to Plaintiffs at the pleading stage, but SHEIN should be able to promptly produce such data in response to Plaintiffs' discovery requests.

119.   Each and every use of the U.S. Mail and interstate wires described above was committed by Defendants with the specific intent to defraud the victims or to obtain the property of the victims by means of false or fraudulent pretenses, representations, or promises.  Defendants' acts of wire fraud in violation of 18 U.S.C. §§ 1341, 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

120.   The consumers and others relied on Defendants' explicit or implicit fraudulent representation that SHEIN owned the copyrights to the designs displayed on its App and/or its fraudulent omission that LATR is in fact a method of facilitating intellectual property theft.

## **COUNT I**

### **Copyright Infringement**

### **(By Perry, Against All Defendants)**

121.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

122.   Perry created the design "Make it Fun." Not long after, Perry discovered that both Shein.com and Romwe.com (a related web site, she learned) were selling brazen copies of one of Perry's designs. After she complained through contact forms on the web sites ("I noticed that Shein has been selling my work as both wall art and phone cases without my permission or approval. It is incredibly disheartening, insulting, and downright evil to profit off of artists without their knowledge or permission"), an agent at the email address copyright@shein.com offered to pay her $500, without release or settlement language. The offering was apparently on behalf of both Romwe and SHEIN; and directed Perry to collect her $500 by invoicing a company called "Zoetop," which she of course had never heard of.  Curiously, SHEIN handled the negotiations in badly translated, robotic English—quite different than the corporate persona under which they offer their highly polished public relations communications:

> SHEIN very much respects IP rights of any third parties. …. From our initial investigation, this product bearing the disputed design was not produced by our company, they were bought as finished goods from a local vendor in a large art painting and accessory market in China. We did request our suppliers to provide us with only non-infringement products. Besides, before we display the product on our website, we take necessary measures to check the print and text and did not find any IP records, given the method we use. In this respect, we did our diligence to avoid any IP violation. We will check more thoroughly in the future. [¶] Thanks for your kindly inform and please let us know shall you have any further questions.

123.   "Make It Fun" is an original artwork first created by Perry in 2016, with its date of first publication September 1, 2018. Perry applied to the copyright office and received registration for the Artwork on May 1, 2023, with registration number VA 2-344-429.

124.   After Perry's creation of the "Make It Fun" artwork and (on information and belief) with full knowledge of Perry's intellectual property rights in the artwork, Defendants infringed Perry's artwork by making and selling a mechanical copy of Perry's artwork, as seen below (Perry's copyrighted artwork on the left and SHEIN's infringing copy being sold on its website, on the right):

1

2

3

 

4

5

6

7

8

9      125.   Defendants continued to willfully infringe this copyrighted design by

10   selling a mechanical, infringing copy of the "Make It Fun" artwork, even after Perry

11   contacted Defendants.

12      126.   All of Defendants' acts were performed without Perry's permission,

13   license, or consent. Defendants' infringement was particularly egregious in that it

14   was willful and undertaken for purposes of commercial advantage and private

15   financial gain.

16      127.   As a result of Defendants' infringement, Perry has suffered and will

17   continue to suffer substantial damage to her business in the form of diversion of

18   trade, loss of profits, and a diminishment in the value of her designs and art, her

19   rights, and her reputation; all in amounts that are not yet ascertainable but not less

20   than the jurisdictional minimum of this court. As a result of Defendants' misconduct

21   as alleged herein, Perry's reputation as a designer and her career has been

22   irreparably tarnished, diminishing the value of her works, and decreasing revenue

23   derived from her work.

24      128.   By reason of its infringement of Perry's copyrighted design as alleged

25   herein, Defendants are also liable to her for the actual damages she has incurred as a

26   result of the infringement, and for any profits of Defendants directly or indirectly

27   attributable to such infringement.

28

## COUNT II

### Copyright Infringement

### (By Perry, Against All Defendants)

129.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

130.   The following year, Perry was contacted by SHEIN (and Romwe) to request to license her work for use on its clothing. The request declared that it was being made by the websites.

> Hello Perry, My name is iris, representing SHEIN.com and ROMWE.com. … We are looking to work with aspiring artists like yourself and create capsule collections with your work! We think your art will be a big hit with our global consumers on both platforms. Combined, SHEIN and ROMWE have over 20 million followers and consumers worldwide. This is a great opportunity to showcase the world who you are and your art!

131.   The email went on to describe what sounded like significant money to be made. Rather than sell out and accept this money, Perry flatly declined the invitation without mincing words, showing just how detrimental an association with SHEIN can be:

> How dare you contact me after my artwork has been stolen and the hard time I was put through with the people at Shein to resolve it. This email disgusts me. Shein and Romwe have stolen artwork from both myself and many of my hardworking friends and colleagues. Your business practices are ethically and morally so wrong and I want nothing to do with your company. I want to be perfectly clear: Never contact me again. Your businesses have no reason to exist at this point and I hope they burn to the ground. You had your chance years ago to "showcase" my art by properly purchasing it instead of blindly selling it for your own gain.

132.   Perry then signed off with a prescient prediction: "Never contact me again — but who knows maybe we'll be in touch because I'm sure it isn't the last time my hard work will be used without my knowledge or consent." And here we are.

133.   In August 2020, Perry created the design "Floral Bloom" to be fabricated as a blanket, which went on sale on October 21, 2020. Not long after Perry's blanket went on sale, she discovered that SHEIN was selling an identical

1102992.1

knock off version. Fortunately, Perry was steered to a lawyer who knows how to handle her case—but otherwise she, or even most lawyers, would have accepted any minimal sum as compensation due to uncertainty about how to properly seek more appropriate remedies.

134.   "Floral Bloom" is an original design first created by Perry in 2020, with its date of first publication October 21, 2020. Perry applied to the copyright office and received registration for the Artwork on May 1, 2023, with registration number VA 2-344-753.

135.   After Perry's creation of the "Floral Bloom" design and (on information and belief) with full knowledge of Perry's intellectual property rights in the artwork, Defendants infringed Perry's artwork by using a mechanical copy of Perry's pattern on an identical throw blanket as the one Perry sells, as seen below:



136.   Defendants continue to willfully infringe this copyrighted design by continuing to sell the infringing throw blanket with a mechanical copy of the "Floral Bloom" design.

137.   All of Defendants' acts were performed without Perry's permission, license, or consent. Defendants' infringement was particularly egregious in that it was willful and undertaken for purposes of commercial advantage and private financial gain.

138.   As a result of Defendants' infringement, Perry has suffered and will continue to suffer substantial damage to her business in the form of diversion of

trade, loss of profits, and a diminishment in the value of her designs and art, her rights, and her reputation; all in amounts that are not yet ascertainable but not less than the jurisdictional minimum of this court. As a result of Defendants' misconduct as alleged herein, Perry's reputation as an artist and designer and her career has been irreparably tarnished, diminishing the value of her works, and decreasing revenue derived from her work.

139.   By reason of its infringement of Perry's copyrighted artwork as alleged herein, Defendants' are also liable to her for the actual damages she has incurred as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

## COUNT III

### Copyright Infringement

### (By Baron, Against All Defendants)

140.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

141.   "Trying My Best" is an original visual artwork first created by Baron in 2016, with its date of first publication on November 16, 2016. "Trying My Best" is an original work protected by copyright law. Baron applied to the copyright office for registration for the artwork, and received registration for the artwork on April 27, 2018, with registration number VA 2-125-614.

142.   After Baron's creation of the "Trying My Best" artwork and (on information and belief) with full knowledge of Baron's intellectual property rights in the artwork, Defendants infringed Baron's artwork by selling a mechanical copy of the "Trying My Best" artwork, as seen below:



1102992.1

143.   Defendants continued to willfully infringe Baron's copyright by continuing to sell the infringing, mechanical copy of "Trying My Best" on Defendants' websites.

144.   All of Defendants' acts were performed without Baron's permission, license, or consent. Defendants' infringement was particularly egregious in that it was willful and undertaken for purposes of commercial advantage and private financial gain.

145.   As a result of Defendants' infringement, Baron has suffered and will continue to suffer substantial damage to his business in the form of diversion of trade, loss of profits, and a diminishment in the value of his Art, rights, and reputation; all in amounts that are not yet ascertainable but not less than the jurisdictional minimum of this court. As a result of Defendants' misconduct as alleged herein, Baron's reputation and career has been irreparably tarnished, diminishing the value of his works, and decreasing revenue derived from his work.

146.   By reason of its infringement of Baron's copyright as alleged herein, Defendants are also liable to him for the actual damages he has incurred as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

## COUNT IV

### Copyright Infringement

### (By Blintz, Against All Defendants)

147.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

148.   Blintz created the design "Orange Daisies" on October 23, 2018, and the first garment using the "Orange Daisies" design was offered for sale on July 28, 2019, a pair of overalls with the Orange Daisies pattern.

149.   Soon after, Blintz discovered SHEIN selling overalls with a pattern identical to her "Orange Daisies" pattern.

150. "Orange Daisies" is an original design created by Blintz, with its date of first publication July 28, 2019. Blintz applied to the copyright office and received registration for the Artwork on April 27, 2023, registration number VA 2-343-963.

151. After Blintz's creation of the "Orange Daisies" design and (on information and belief) with full knowledge of Blintz's intellectual property rights, Defendants infringed Blintz's artwork by making and selling a garment with a mechanical copy of Blintz's artwork, as seen below (Blintz product with copyrighted design, left; SHEIN's product with mechanical copy of pattern right):

 

152. Defendants willfully infringe Blintz's copyrighted design by selling a mechanical, infringing copy of the "Orange Daisies" artwork.

153. All of Defendants' acts were performed without Blintz's permission, license, or consent.

154. As a result of Defendants' infringement, Blintz has suffered and will continue to suffer substantial damage to her business in the form of diversion of trade, loss of profits, and a diminishment in the value of her designs and art, her rights, and her reputation; all in amounts that are not yet ascertainable but not less than the jurisdictional minimum of this court. As a result of Defendants' misconduct as alleged herein, Blintz's reputation as an artist and designer and her career has been irreparably tarnished, diminishing the value of her works, and decreasing revenue derived from her work.

155. By reason of its infringement of Blintz's copyrighted design as alleged herein, Defendants are also liable to her for the actual damages she has incurred as a

result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

### COUNT V

### Trademark Infringement (15 U.S.C. § 1114)

### (By Baron, Against All Defendants)

156.   Plaintiffs incorporate by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

157.   Through Baron's use in commerce of the phrase and graphic "Trying my Best," shown above, the public has come to associate that mark with Baron and his products. Further, the public has come to understand the mark as an indicator that Baron is the source of the goods bearing the mark.

158.   Baron's trademark "Trying My Best" was registered by the United States Patent and Trademark Office on January 9, 2018, on the principal register, and thereafter maintained, with Serial Number 87-745,875. Plaintiff remains the current holder of the mark. Defendants' use of the "Trying My Best" trademark is likely to cause confusion, deception, and mistake by creating the false and misleading impression that SHEIN's goods are manufactured, associated with or connected with Baron, or have the sponsorship, endorsement, or approval of Baron.

159.   Defendants' use of the "Trying My Best" trademark is identical to Baron's federally registered mark in violation of 15 U.S.C. § 1114, as seen below:



160.   Defendants' activities are causing and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to Baron's goodwill and reputation.

1102992.1

161.   Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Baron's mark to Baron's great and irreparable harm.

162.   Defendants caused and are likely to continue causing substantial injury to the public and to Baron, and Baron is entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

<u>**COUNT VI**</u>

**Copyright Infringement**

**(By Pfeffer, Against All Defendants)**

163.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

164.   "Cat Hair Pin" is an original artwork first created by Pfeffer in 2016, with its date of first publication on August 31, 2016. "Cat Hair Pin" is an original work protected by copyright law. Pfeffer applied to the copyright office and for registration for the work. Plaintiff has complied in all respects with the Copyright Act and all other laws governing copyright. Plaintiff has complied with 17 U.S.C. § 411 in that the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form, and registration has been refused.

165.   "Small Honeycomb Hair Pin" is an original design first created by Pfeffer in 2016, with its date of first publication October 16, 2016. Pfeffer applied to the copyright office and received registration for the Artwork on March 7, 2022, with registration number VA 2-296-180.

166.   "Big Honeycomb Hair Pin" is an original design first created by Pfeffer in 2016, with its date of first publication December 16, 2016. Pfeffer applied to the copyright office and received registration for the Artwork on April 27, 2022, with registration number VA 2-306-180.

167.   After Pfeffer's creation of these artworks and (on information and

belief) with full knowledge of Pfeffer's intellectual property rights in the works, Defendants infringed Pfeffer's artwork by selling mechanical copies of the works, as seen below:



168.   On information and belief, Defendants have continued to willfully infringe Pfeffer's copyright by continuing to sell the infringing, mechanical copies of her works on Defendants' websites.

169.   All of Defendants' acts were performed without Pfeffer's permission, license, or consent. Defendants' infringement was particularly egregious in that it was willful and undertaken for purposes of commercial advantage and private financial gain.

170.   As a result of Defendants' infringement, Pfeffer has suffered and will continue to suffer substantial damage to her business in the form of diversion of trade, loss of profits, and a diminishment in the value of her art, rights, and

reputation; all in amounts that are not yet ascertainable but not less than the jurisdictional minimum of this court. As a result of Defendants' misconduct as alleged herein, Pfeffer's reputation and career has been irreparably tarnished, diminishing the value of her works, and decreasing revenue derived from her work.

171.   By reason of its infringement of Pfeffer's copyright as alleged herein, Defendants are also liable to her for the actual damages she has incurred as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

## COUNT VII

### Trademark Infringement (15 U.S.C. § 1114)

### (By Dirt Bike Kidz, Against All Defendants)

172.   Plaintiffs incorporate by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

173.   Through Dirt Bike Kidz's use in commerce of the phrase and graphic "Dirt Bike Kidz," shown below, the public has come to associate that mark with Dirt Bike Kidz and its products. Further, the public has come to understand the mark as an indicator that Dirt Bike Kidz is the source of the goods bearing the mark.

174.   Dirt Bike Kidz's trademark "Dirt Bike Kidz" was registered by the United States Patent and Trademark Office on March 3, 2015, on the principal register, and thereafter maintained, with Serial Number 4696234. Plaintiff remains the current holder of the mark. Defendants' use of the "Dirt Bike Kidz" trademark is likely to cause confusion, deception, and mistake by creating the false and misleading impression that SHEIN's goods are manufactured, associated with or connected with Dirt Bike Kidz, or have the sponsorship, endorsement, or approval of Dirt Bike Kidz.

175.   Defendants' use of the "Dirt Bike Kidz" trademark is identical to Dirt Bike Kidz's federally registered mark in violation of 15 U.S.C. § 1114, as seen below:

1102992.1



*Dirt Bike Kidz*                    *Shein's Knockoff*

176.   Defendants' activities are causing and, unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to Dirt Bike Kidz's goodwill and reputation.

177.   Defendants' actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Dirt Bike Kidz's mark to Dirt Bike Kidz's great and irreparable harm.

178.   Defendants caused and are likely to continue causing substantial injury to the public and to Dirt Bike Kidz, and Dirt Bike Kidz is entitled to injunctive relief and to recover Defendants' profits, actual damages, enhanced profits and damages, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1114, 1116, and 1117.

## **COUNT VIII**

### **Copyright Infringement**

### **(By Estellejoylynn, LLC, Against All Defendants)**

179.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

180.   The photographs "Beach Bracelets 1" and "Beach Bracelets 2" (collectively, the "Beach Bracelet Photos") are original works of art first created by EJL in 2023, with its date of first publication in April 2023. The "Beach Bracelet Photos" are original works protected by copyright law. EJL applied to the copyright office and for registration for the works on September 29, 2023. Plaintiff has

1102992.1

complied in all respects with the Copyright Act and all other laws governing copyright. Plaintiff has complied with 17 U.S.C. § 411 in that the deposit, application, and fee required for registrations have been delivered to the Copyright Office in proper form, and registration has been granted, with registration number VA 2-364-536.

181.   After EJL's creation of the "Beach Bracelet Photos" works and (on information and belief) with full knowledge of EJL's intellectual property rights in the works, Defendants infringed EJL's works by using mechanical copies of the "Beach Bracelet Photos" as seen below:

 

 

182.   On information and belief, Defendants have continued to willfully infringe EJL's copyrights by continuing to use the infringing, mechanical copies of her "Beach Bracelet Photos" works on Defendants' websites.

183.   All of Defendants' acts were performed without EJL's permission, license, or consent. Defendants' infringement was particularly egregious in it was willfully undertaken for commercial advantage and private financial gain.

184.   As a result of Defendants' infringement, EJL has suffered and will

continue to suffer substantial damage to its business in the form of diversion of trade, loss of profits, and a diminishment in the value of its art, rights, and reputation; all in amounts that are not yet ascertainable but not less than the jurisdictional minimum of this court. As a result of Defendants' misconduct as alleged herein, EJL's reputation and career has been irreparably tarnished, diminishing the value of its works, and decreasing revenue derived from its work.

185.   By reason of its infringement of EJL's copyrights as alleged herein, Defendants are also liable to it for the actual damages EJL has incurred as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

<u>**COUNT IX**</u>

**Removal of Copyright Management Information in Violation of the Digital Millennium Copyright Act (17 U.S.C 1202(b))**

**(By Estellejoylynn, LLC, Against All Defendants)**

186.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

187.   The Beach Bracelet Photos contained copyright management information protected under 17 U.S.C. Section 1202(b), including EJL's logo, as shown below:



188.   Defendants intentionally removed that copyright management information in the copies of the Beach Bracelet Photos Defendants used on their

websites.

189.  Defendants' conduct constitutes a violation of 17 U.S.C. Section 1202(b).

190.  Defendants' removal of copyright management information was done without EJL's knowledge or authorization.

191.  On information and belief, Defendants' removal of copyright management information was done by Defendants intentionally, knowingly, and with the intent to conceal Defendants' infringement of EJL's copyright in the Beach Bracelet Photos. Defendants also knew, or had reason to know, that such removal and/or alteration of copyright management information would conceal Defendants' infringement of EJL's copyrights in the Beach Bracelet Photos. Lacking any way to know Defendants' states of mind, EJL pleads Defendants' intent/knowledge on information and belief. The basis for such information and belief is an inference from the nature of Defendants' copying: the most plausible explanation for Defendants' choice to remove the EJL logo from Defendants' copies of Plaintiff's photographs is that that Defendants intended to obscure Plaintiff's company logo in order to make it less likely that Plaintiff would learn of Defendants' infringement.

192.  Plaintiff has sustained significant injury and monetary damages as a result of Defendants' wrongful acts as hereinabove alleged. Plaintiff is at present unable to ascertain the full extent of the monetary damages it has suffered by reason of said acts. In order to determine the full extent of such damages, including such profits of Defendants as may be recoverable under 17 U.S.C. Section 1203, Plaintiff requires an accounting from each Defendants of all monies generated from their wrongful falsification, alteration, and removal of Plaintiff's copyright management information.

193.  In the alternative, Plaintiff may elect to recover statutory damages pursuant to 17 U.S.C. Section 1203(c)(3) in a sum of not more than $25,000 from Defendants for each violation of 17 U.S.C. 1202.

## COUNT X

### Copyright Infringement

### (By Jessica Louise Thompson Smith, Against All Defendants)

194.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

195.   "Avril Skull" is an original artwork first created by Smith in 1999, with its date of first publication at least as early as November 2004, when Smith began selling tops featuring the work (below, right). This work has become one of Smith's most popular designs after being prominently worn by musician Avril Lavigne.

  

196.   "Avril Skull" is an original work protected by copyright law. Smith applied to the copyright office and for registration for the work on October 5, 2023. Plaintiff has complied in all respects with the Copyright Act and all other laws governing copyright. Plaintiff has complied with 17 U.S.C. § 411 in that the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form, and registration has been granted (U.S. Copyright Registration No. VA00012364821).

197.   After Smith's creation of the "Avril Skull" work and (on information and belief) with full knowledge of Smith's intellectual property rights in the work,

1102992.1

Defendants infringed Smith's artwork by selling a mechanical copy of the "Avril Skull" on nearly identical garments as Smith's—and, as shown below, intentionally marketing these infringing goods with photographs that mimic musician Avril Lavigne in order to deceive customers about the origin of the garments:



198.   On information and belief, Defendants have continued to willfully infringe Smith's copyright by continuing to sell the infringing, mechanical copy of her "Avril Skull" on Defendants' websites.

199.   All of Defendants' acts were performed without Smith's permission, license, or consent. Defendants' infringement was particularly egregious in it was willful and undertaken for purposes of commercial advantage and private financial gain.

200.   As a result of Defendants' infringement, Smith has suffered and will

continue to suffer substantial damage to her business in the form of diversion of trade, loss of profits, and a diminishment in the value of her art, rights, and reputation; all in amounts that are not yet ascertainable but not less than the jurisdictional minimum of this court. As a result of Defendants' misconduct as alleged herein, Smith's reputation and career has been irreparably tarnished, diminishing the value of her works, and decreasing revenue derived from her work.

201.   By reason of its infringement of Smith's copyright as alleged herein, Defendants are also liable to her for the actual damages she has incurred as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

## COUNT XI

### Copyright Infringement

### (By Liv Lee, Against All Defendants)

202.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

203.   "Wonky Flowers," "Cassias," and "Agapanthus" (collectively, the "Lee Works" shown below) are original artworks first created by Lee in Australia, with their respective dates of first publication at least as early as September 2020, April 2022, and April 2020.

  

204.   The Lee Works are exempt from the registration requirement under 17

U.S.C. § 411 because they are not a "United States work," as that term is defined under 17 U.S.C. § 101.

205.   After Lee's creation of the "Lee Works" and (on information and belief) with full knowledge of Lee's intellectual property rights in the Lee Works, Defendants infringed Lee's artwork by selling mechanical copies of the "Lee Works":





1102992.1

206.   On information and belief, Defendants have continued to willfully infringe Lee's copyrights by continuing to sell the infringing, mechanical copies of her "Wonky Flowers," "Cassias," and "Agapanthus" on Defendants' websites.

207.   All of Defendants' acts were performed without Lee's permission, license, or consent. Defendants' infringement was particularly egregious in it was willful and undertaken for purposes of commercial advantage and private financial gain.

208.   As a result of Defendants' infringement, Lee has suffered and will continue to suffer substantial damage to her business in the form of diversion of trade, loss of profits, and a diminishment in the value of her art, rights, and reputation; all in amounts that are not yet ascertainable but not less than the jurisdictional minimum of this court. As a result of Defendants' misconduct as alleged herein, Lee's reputation and career has been irreparably tarnished, diminishing the value of her works, and decreasing revenue derived from her work.

209.   By reason of its infringement of Lee's copyright as alleged herein, Defendants are also liable to her for the actual damages she has incurred as a result of the infringement, and for any profits of Defendants directly or indirectly attributable to such infringement.

## COUNT XII

### Racketeer Influenced and Corrupt Organizations Act

### 18 U.S.C. §§ 1962(c) and 1964(c)

### (By all Plaintiffs, Against Xu and Chiao)

210.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

### Defendant Persons / Enterprises

211.   Xu, Chiao, SDC, SFG, Roadget, Zeotop, FMMGI, Guangzhou, Style Link, Shein Tech, Aitken, Wei, and the Shein Law Firms (or any subset or combination of this group) constitute an "enterprise," within the meaning of 18 U.S.C.

1102992.1

§§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "SHEIN Enterprise").

    a.  Xu, Chiao, SDC, SFG, Roadget, Zoetop, Guangzhou, Style Link, Shein Tech, Aitken, Wei, and/or the Shein Law Firms share the common purpose of (among other things) advancing SHEIN's business of selling clothing and apparel and enabling SHEIN to misappropriate and profit from the intellectual property of others with impunity.

    b.  Xu, Chiao, SDC, SFG, Roadget, Zoetop, Guangzhou, Style Link, Shein Tech, Aitken, Wei, and/or the Shein Law Firms are related in that they are all members or agents of SHEIN and that all seek to advance the business interests of SHEIN.

    c.  The SHEIN Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the SHEIN Enterprise has operated since 2016 and continues to operate to this day.

Xu and Chiao are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the SHEIN Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consisted of, but was not limited to, the acts of criminal copyright infringement (*supra*) and wire fraud (*supra*).

    212.  SDC, SFG, Roadget, Zoetop, Guangzhou, FMMGI, Style Link, and Shein Tech each, individually, constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that each is a "legal entity." Xu and Chiao are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of SDC, SFG, Roadget, Zoetop, Guangzhou, Style Link, or Shein Tech through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) &

1962(c).  Said pattern of racketeering activity consisted of, but was not limited to, the

acts of criminal copyright infringement (*supra*) and wire fraud (*supra*).

213.   Chiao constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that Chiao is an "individual." Xu is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Chiao through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consisted of, but was not limited to, the acts of criminal copyright infringement (*supra*) and wire fraud (*supra*).

214.   At all relevant times, the enterprises alleged herein were engaged in, and their activities affected, interstate commerce and foreign commerce.

### Pattern of Racketeering Activity

215.   All of the acts of racketeering described herein were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to misappropriate the designs of, infringe the copyrights of, and defraud Plaintiffs and other similarly situated designers; their common result was to misappropriate the designs of, infringe the copyrights of, and defraud Plaintiffs and other similarly situated designers; Xu and/or Chiao personally, and through their agents or enterprises described above, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Plaintiffs, other similarly situated designers, consumers, and the public were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

216.   All of the acts of racketeering described herein were continuous so as to form a pattern of racketeering activity in that Xu and/or Chiao have engaged in the predicate acts for a substantial period of time and/or Xu's and/or Chiao's acts of racketeering project into the future with a threat of repetition in that the acts of racketeering are the regular way in which Defendants do business.

217.   As a direct and proximate result of, and by reason of, the activities of Xu and Chiao and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). Plaintiffs' damages include, but are not limited to, diversion of trade, loss of profits, and a diminishment in the value of their designs and art, their rights, and their respective reputations. Plaintiffs are, therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

218.   Pursuant to 18 U.S.C. § 1964(a), Xu and Chiao should be ordered to disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c).

## COUNT XIII

### Racketeer Influenced and Corrupt Organizations Act

### 18 U.S.C. §§ 1962(c) and 1964(c)

### (By all Plaintiffs, Against SDC, Zoetop, and Roadget)

219.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

### Defendant Persons / Enterprises

220.   SDC, SFG, Roadget, Zoetop, FMMGI, Guangzhou, Style Link, Shein Tech, and the Shein Law Firms (or any subset or combination of this group) constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "SHEIN Corporate Enterprise").

    a.   SDC, SFG, Roadget, Zoetop, FMMGI, Guangzhou, Style Link, Shein Tech, and the Shein Law Firms share the common purpose of (among other things) advancing SHEIN's business of selling clothing and apparel and enabling SHEIN to misappropriate and profit from the intellectual property of others with impunity.

b. SDC, SFG, Roadget, Zoetop, FMMGI, Guangzhou, Style Link, Shein Tech, and the Shein Law Firms are related in that they are all members or agents of Shein and that all seek to advance the business interests of Shein.

c. The SHEIN Corporate Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the SHEIN Corporate Enterprise has operated since 2016 and continues to operate to this day.

SDC, Roadget, and/or Zoetop, are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the SHEIN Corporate Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the acts of criminal copyright infringement (*supra*) and wire fraud (*supra*). At all relevant times, the SHEIN Corporate Enterprise's activities affected, interstate commerce and foreign commerce.

**Pattern of Racketeering Activity**

221.   All of the acts of racketeering described herein were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to misappropriate the designs of, infringe the copyrights of, and defraud Plaintiffs and other similarly situated designers; their common result was to misappropriate the designs of, infringe the copyrights of, and defraud Plaintiffs and other similarly situated designers; SDC, Roadget, and Zoetop, personally or through their agents or other members of SHEIN, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Plaintiffs, other similarly situated designers, consumers, and the public were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

222.   All of the acts of racketeering described herein were continuous so as to form a pattern of racketeering activity in that SDC, Roadget, and/or Zoetop have engaged in the predicate acts for a substantial period of time (2016 – the present) and/or SDC's, Roadget's, and/or Zoetop's acts of racketeering project into the future with a threat of repetition in that the acts of racketeering are the regular way in which Defendants do business.

223.   As a direct and proximate result of, and by reason of, the activities of SDC, Roadget, and/or Zoetop and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). Plaintiffs' damages include, but are not limited to, diversion of trade, loss of profits, and a diminishment in the value of their designs and art, their rights, and their respective reputations. Plaintiffs are, therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

224.   Pursuant to 18 U.S.C. § 1964(a), SDC, Roadget, and/or Zoetop should be ordered to disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c).

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.   That each Plaintiff is awarded all damages, including future damages, that Plaintiff has sustained, or will sustain, due to the acts complained of herein, subject to proof at trial;

2.   That each Plaintiff is awarded their costs and expenses in this action;

3.   That each Plaintiff is awarded their attorneys' fees;

4.   For an order permanently enjoining Defendants and their employees, agents, servants, attorneys, representatives, successors, and assigns, and all persons in active concert or participation with any of them, from engaging in the misconduct referenced herein;

5.      That Defendants be ordered to file with this Court and serve upon Plaintiffs' counsel within thirty (30) days after services of the judgment demanded herein, a written report submitted under oath setting forth in detail the manner in which they have complied with the judgment;

6.      For disgorgement of all proceeds, and restitution of the moneys wrongfully received by Defendants as the result of their wrongful conduct;

7.      That each Plaintiff is awarded punitive damages in an amount sufficient to deter Defendants, and each of them, from their wrongful conduct;

8.      For payment of treble damages to each Plaintiff pursuant to 18 U.S.C. § 1964(c); and

9.      For further relief, as the Court may deem appropriate.


DATED: March 19, 2024                    WOOLLS PEER DOLLINGER & SCHER


By:    __/s/_____

           Antoinette Waller
Attorneys for Plaintiffs

1102992.1

THIRD AMENDED COMPLAINT

# DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on their claims on all issues triable by a jury.

DATED: March 19, 2024                    WOOLLS PEER DOLLINGER & SCHER


By:    ___/s/_____

                        Antoinette Waller
            Attorneys for Plaintiffs

THIRD AMENDED COMPLAINT

1102992.1